**ALLEN B. DUMONT LABORATORIES,
Inc. et al. v. CARROLL et al.**

No. 10136.

United States Court of Appeals
Third Circuit.

Argued June 9, 1950.

Decided Sept. 5, 1950.

154

Harry F. Stambaugh, Pittsburgh, Pa. (Abraham J. Levy, Special Deputy Attorney General, T. McKeen Chidsey, Attorney General, on the brief), for appellants.

Earl G. Harrison, Philadelphia, Pa. (W. Theodore Pierson, Henry B. Weaver, Jr., Morton H. Wilner, Thad H. Brown and George O. Sutton, all of Washington, D. C., Philip Dechert, Schnader, Harrison, Segal & Lewis, Wm. A. Schnader and Edward W. Mullinix, all of Philadelphia, Pa., on the brief), for appellees.

Before BIGGS, Chief Judge, and MARIS and GOODRICH, Circuit Judges.

BIGGS, Chief Judge.

The suit at bar was brought under the Federal Declaratory Judgments Act, now Sections 2201, 2202, Title 28 U.S.C.A. to determine whether the Commonwealth of Pennsylvania, pursuant to a regulation [1] promulgated by the State Board of Censors under the Act of May 15, 1915, P.L. 534, as amended, 4 P.S. §§ 41–58,[2] may censor films used by the plaintiffs in projecting television programs in the State of Pennsylvania. The court below found among other things, D.C., 86 F.Supp. 813, that the regulation promulgated by the Board of Censors conflicted with federal authority in a field fully occupied by Congress when it enacted the Radio Act of 1927, 44 Stat. 1162, and the Communications Act of 1934, 47 U.S.C.A. § 151 et seq., and found the regulation invalid. The members of the Board of Censor have appealed.

■ The television programs broadcast by the plaintiffs are received by persons possessing television sets not only within the borders of the Commonwealth of Pennsylvania but also, depending upon the location and power of the broadcasting station, in Delaware, Maryland, New Jersey, West Virginia, Ohio and New York.[3] As was found by the court below, "There is no way by which the television broadcasts of the plaintiffs can possibly be confined so as to be received exclusively by receiving sets within Pennsylvania."[4] The record also demonstrates that some of the plaintiffs' programs are delivered by wire or radio relay from television stations located outside of Pennsylvania. There is no doubt but that television broadcasting is in interstate commerce. This is inherent in its very nature.

We think it unnecessary to describe in any great detail the technical methods whereby films are made or procured and employed by the television industry. "Live" programs consist of the broadcast of pictures of living persons actually before the camera at the time of transmission. But film may be integrated into an otherwise live program to furnish sound, action or background. By the process known as "kinescope recording" or "teletranscription" live programs may be and frequently are recorded on film at the time of their production to the end that the film can be used for broadcasts of the programs. By "bicycling" the same print may be used successively at different broadcasting stations distant from each other. Of the films used for television broadcasting by the plaintiff stations only a small part are made or originate within Pennsylvania. The record

1. The complete text of the regulation follows:

"13. Miscellaneous Provisions

"(d.) Projection of motion pictures by television. All motion picture films, reels or views intended for projection or broadcast by television in Pennsylvania must first be submitted by the exchange, owner or lessee of the film, reel, or view for censorship purposes, and must not be projected by television in Pennsylvania unless first approved by the Board and a seal issued therefor upon payment of the proper fee, and said proper approval seal displayed upon every showing."

2. Section 2 of the Act provides: "It shall be unlawful to sell, lease, lend, exhibit, or use any motion-picture film, reel, or view, in Pennsylvania, unless the said film, reel, or view has been submitted by the exchange, owner, or lessee of the film, reel, or view, and duly approved by the Pennsylvania State Board of Censors, hereinafter in this Act called the Board."

3. As to operable ranges of television transmitting stations see F.C.C. Dockets Nos. 8736 and 8975.

4. See Finding No. 6.

also demonstrates that of all the broadcasting conducted by the television stations of the United States at least 25% consists of the projecting of films. The percentage of films used in the industry is growing constantly.

■ We agree with the court below that the Communications Act of 1934 covers the television, as well as the radio, field. Section 2(a) of the Act, 47 U.S.C.A. § 152(a), provides: "The provisions of this chapter shall apply to all interstate and foreign communication by wire or radio and all interstate and foreign transmission of energy by radio, which originates and/or is received within the United States, and to all persons engaged within the United States in such communication or such transmission of energy by radio and to the licensing and regulating of all radio stations as hereinafter provided * * *"

■ Section 3(b), 47 U.S.C.A. § 153(b), defines "radio communication" as "The transmission by radio of writing, signs, signals, pictures, and sounds of all kinds * * *". The television and radio industries have construed this definition to include television as "one form of radio transmission". There can be no doubt of the correctness of this construction. See, for example, the testimony of Lodge, a Columbia Broadcasting System engineer. Section 3(d) states that "Transmission of energy by radio" or radio transmission subd. (b) "means the transmission by radio of writing, signs, signals, pictures, and sounds of all kinds * * *" Section 303(g), 47 U.S.C.A. § 303(g), requires the Federal Communications Commission to study new uses for radio and both that body and its predecessor, the Federal Radio Commission,[5] historically have exercised wide supervision over the development of television or "visual broadcasting" and have reported their work in this connection to Congress.[6] The Communications Act of 1934 applies to every phase of television and it is clear that Congress intended the regulatory scheme set out by it therein to be exclusive of State action. See Section 301, 47 U.S.C.A. § 301, which recites the purpose of the Act as, *inter alia,* the maintenance of " * * * the control of the United States over all the channels of interstate and foreign radio transmission * * *"

If there were any doubt respecting the intention of Congress in this respect, it would be set at rest by legislative history. Senate Report No. 781 discussing Senate Bill S. 3285 which later was enacted as the Federal Communications Act stated, "The purpose of this bill is to create a communications commission with regulatory power over all forms of electrical communication. * * *[7] The language employed is so all inclusive as to leave no doubt but that it was the intention of Congress to occupy the television broadcasting field in its entirety. While Section 410(a) provides for a measure of cooperation between the Federal Commission and State regulatory bodies, it is clear that under the plan set out by that section the Federal Commission remains the dominant regulatory force, members of the State regulatory bodies being engrafted, as it were, temporarily upon the Federal Commission.

■ The Pennsylvania State Board of Censors contends in effect that the field of censorship was left open by the Federal Communications Act and therefore the State Board of Censors as an exercise of

5. See Radio Act of 1927, 44 Stat. 1162.

6. See, e. g., Annual Report Fed. Radio Comm'n. 28 (1929), reporting the setting aside of certain frequencies for experimental work in visual broadcasting and reporting that certain technical information had been obtained as a result of experimental work in this field. In later reports, the Commission, and its successor, the FCC, have consistently reported the exercise of jurisdiction over television.

7. Report of the Senate Committee on Interstate Commerce, S.Rept. 781, 73rd Cong., 2nd Sess. p. 1 and see also Report of House Committee on Interstate and Foreign Commerce, H.Rept., 1850, 73rd Cong., 2nd Sess. p. 3. The history of federal regulation of radio communications is summarized in National Broadcasting Co., Inc., v. United States, 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344.

State police power may censor films used in television broadcasting. But, as was said by Mr. Chief Justice Taney in the License Cases, 5 How. 504, 582, 12 L.Ed. 256, the police power of a State consists of the exercise by a sovereign of the powers inherent in its "dominion" and the sovereignty of the Commonwealth of Pennsylvania cannot be exercised to censor motion picture films employed in television broadcasting because the broadcasting of films by television does not lie within the dominion of the Commonwealth. We cannot agree with the contention of the Board of Censors that censorship by the States is permitted under the Act. While Section 326, 47 U.S. C.A. § 326, declares it to be a national policy that nothing in the Act shall be understood to give the Federal Commission "power of censorship" over radio communications and that no regulation or condition shall be promulgated or fixed by the Commission which shall interfere "with the right of free speech by means of radio communication", this does not mean that the States may exercise a censorship specifically denied to the Federal agency. Censorship may be defined as the forbidding of publication, i. e. prohibition of publication in advance of publication.[8] The Act itself demonstrates that Congress was vitally concerned with the nature of the programs broadcast as affecting the public good. It, therefore, dealt directly with the subject matter of the broadcasts which Pennsylvania seeks to regulate here. Congress thus set up a species of "program control" far broader and more effective than the antique method of censorship which Pennsylvania endeavors to effectuate in the instant case.

Five provisions of the Communications Act must be noted in this connection. Section 308(b), 47 U.S.C.A. § 308(b) provides for a careful check by the Commission as to the character and responsibility of any person seeking to obtain a license to operate a broadcasting station. Section 307(d), 47 U.S.C.A. § 307(d) deals with applications for renewals of licenses. Sections 309(b) (2) and 310(b), 47 U.S.C.A. §§ 309 (b) (2) and 310(b) prohibit the assignment or transfer of a license without the written consent of the Commission after it has secured full information respecting the responsibility of the assignee or transferee. Section 303(m) (4), 47 U.S.C.A. § 303(m) (D), authorizes the Commission to suspend the license of any operator upon proof that the licensee " * * * has transmitted * * * communications containing profane or obscene words, language, or meaning * * *". Finally, Section 326, now embodied in substance in Section 1464, Title 18 U.S.C.A. provides for the fining and imprisonment of any person who utters any indecent, obscene or profane language by means of radio communication.[9]

It is clear from the foregoing that Congress was concerned with the contents of the programs of all broadcasting stations including television transmitting stations, and provided exemplary penalties, including loss of license and penal sanctions for the transgressor who should broadcast an indecent or obscene program. Congress did not intend to control in advance the broadcasting of radio programs but it did intend to prevent the transmittal of obscene matter through the ether. Program control was entrusted to the Federal Commission and it is an effective one. In National Broadcasting Co. v. United States, 319 U.S. 190, 215–216, 63 S.Ct. 997, 1009, 87 L.Ed. 1344, the Supreme Court said, "The Act itself establishes that the Commission's powers are not limited to the engineering and technical aspects of regulation of radio communication * * * It puts upon the Commission the burden of determining the composition of that traffic." The subject need not be labored further. We think it is clear that Congress has occupied fully the field of television regulation and that that field is no longer open to the States. Congress possessed the constitutional authority to effect this result. Hines v. Davidowitz,

---

8. See Webster's New International Dictionary, 2nd Edition, definition of "Censor".

9. The decision of the Supreme Court in United States v. Alpers, 338 U.S. 680, 70 S.Ct. 352, provides helpful criteria for the construction of this statute.

312 U.S. 52, 74, 61 S.Ct. 399, 85 L.Ed. 581. It follows that the Commonwealth of Pennsylvania cannot censor the films used on the programs of the plaintiffs' stations.

The judgment will be affirmed.