The People of the State of New York, Plaintiff, *v.* Walter Framer and Warren Hull, Defendants.

City Magistrate's Court of New York, Borough of Manhattan, Lower Manhattan Court, December 28, 1954.

*Philip Sokol, Special Assistant Corporation Counsel,* for plaintiff.

*Whitney North Seymour, George G. Gallantz* and *Charles Rembar* for Walter Framer, defendant.

*Sidney Kramer* for Warren Hull, defendant.

OHRINGER, M. The defendants are charged with violating section 603–11.0 of chapter 24 of the Administrative Code of the City of New York, which relates to " *Soliciting of contributions in public* " in the city of New York. Subdivision a thereof, which is the only provision pertaining to the issues in this case, reads: " It shall be unlawful for any person, organization, society, association or corporation or their agents or representatives to solicit money, donations of money or property, or financial assistance of any kind upon the streets, in office or business buildings, by house to house canvass, or in public places in the city, except upon a license issued by the commissioner of welfare ".

It is charged in the complaint that, without being in possession of the foregoing license, defendants have solicited " money, donations of money or property or financial assistance " in studio 51, which is a broadcasting studio operated by the Columbia Broadcasting Company in what was formerly a New York City theatre. This studio 51 is still licensed by the appropriate municipal departments for use as a theatre. It is claimed that such solicitation occurred during the televising of a certain national television program known as " Strike It Rich." Except for the inclusion of television cameras, television sets, broadcasting microphones, broadcasting booths and other equipment used for the broadcasting and televising of programs from the stage of said " theatre," studio 51 is arranged for a gathering of a large group of people to witness what occurs on stage. This audience is admitted free of charge by ticket procured from the sponsors of the program or from the Columbia Broadcasting Company, or even without ticket when seats are available. There is no question that the studio audience may be excluded from studio 51 either by the sponsors of the program or by the Columbia Broadcasting Company. If the " Strike It Rich " program were not televised in the presence of a studio audience, it would be necessary for me to dismiss the charge against the defendants without further discussion because of the decision made by the Third Circuit Court of Appeals in 1950 and approved by the Supreme Court of the United States in *Allen B. Dumont*

*Laboratories, Inc.* v. *Carroll* (184 F. 2d 153, certiorari denied 340 U. S. 929). In that case the court held that films which were televised from a studio in the State of Pennsylvania could not be made the subject matter of an inquiry by the Pennsylvania Board of Censors, which had jurisdiction over the showing of all motion pictures in that State. No studio audience was present in the studio at the time of televising of those films and that case, in my opinion, does not determine the power of a State to control the relationship of its own citizens where that control in no manner constitutes an impairment of the transit of interstate commerce, to-wit: the televised program. Inasmuch as the present case deals with the telecasting of a program in the presence of a studio audience which is physically in a certain place in this city, it is necessary that we explore the various legal issues bearing on the relationships of the Federal and State governments in dealing with the relations between the defendants and the studio audience. Since the *Federal* issues raised by the presence of the studio audience are relevant to a determination of this case only after the *local* issues raised by the defendants are disposed of, we will discuss the Federal questions after dealing with these two *local* contentions of the defendants: (1) that they are not engaged in any solicitation whatsoever within the meaning of the ordinance, and (2) that they are not soliciting (of course, if solicitation exists) in a place defined in the ordinance, particularly because of the Court of Appeals decision in 1926 in *Madison Products Co.* v. *Coler* (242 N. Y. 467, 469).

Before dealing with those issues it is necessary for me to dispose of one serious contention made by the defendants: that this proceeding was instituted at the direction of the commissioner of welfare of the City of New York because he seeks to force the " Strike It Rich " program " off the air." Defendants have made reference to a letter from the commissioner to the Federal Communications Commission in which he attacked the " Strike It Rich " program and asked the commission to take action against the continuance of that program. They have also produced an article written by the commissioner, in a nationally read magazine, attacking the value of that program to the general public. They have also urged that various newspapers in this city are doing, without complaint by the commissioner, in essence, in their opinion, what they are doing during the projection of their program — helping people in need.

I am aware of the fact that the commissioner, who is charged with the responsibility of administering to the needy of this city in accordance with modern concepts, namely: with dignity

and without fanfare, does not approve of the format of the " Strike It Rich " program. However, the issue in this case is not the commissioner's views concerning the program. If the statutes require that defendants procure a license to perform the acts which are the subject of this action, the issue then is: Did they have that license? If the defendants made application for a license and their application was refused because the commissioner did not approve of their program, they would have the right to test his power to deny a license on such a ground in a proceeding in the Supreme Court of this State, pursuant to article 78 of the Civil Practice Act. I must resolve the issue on the legal questions raised by the matters contained in the complaint. Just as the commissioner's views in favor of a program could not have any effect on whether or not a defendant was violating an ordinance, so his views in disapproval of a program may not have any effect on such an issue. Nor can I concern myself with the claim that newspapers are doing the same thing that defendants are doing. A claim that someone else outside the jurisdiction of the court is doing the same thing can never be treated as a serious objection to the determination of the issues raised in a complaint before a court. I wish it understood that my discussion of this matter is not to be interpreted as any indication of my views concerning the merits of the " Strike It Rich " program. A court should not play the role of either a censor or a drama critic (cf. *Joseph Burstyn, Inc.*, v. *Wilson*, 343 U. S. 495). This program is viewed by millions of people, and good or bad, when they tire of it for one reason or another, it will go off the air. The Supreme Court of the United States recently held that even the Federal Communications Commission did not have the power to force the *give away* programs off the air, without positive power in the statute on the pertinent subject, simply because that commission did not think that such programs were in the public interest (see *F. C. C.* v. *American Broadcasting Co.*, 347 U. S. 284).

With respect to defendants' contention that they are not engaged in solicitation within the meaning of the ordinance: I had a visual demonstration of the programs which were telecast in the presence of studio audiences — I was shown, by motion pictures, what actually took place at fourteen different telecastings. Those motion pictures were acknowledged by the defendants to constitute an actual representation of what one, in the studio audience, would see on any one of the fourteen different days those telecastings had occurred. Those films showed that the defendant Hull acted as the primary speaker or master

of ceremonies during the telecasting of the program, interviewing all other persons who appeared on the program either as "contestants" or "guest performers" in a pleasant, gracious and solicitous manner. He interviewed the "contestants" in such a manner as to have them relate their personal difficulties. They had appeared on the program as "contestants" for the purpose of *striking it rich,* as Mr. Hull would announce, so that the difficulty they publicly had related might be alleviated. To accomplish this result they would have to answer correctly a series of "Yes or No" type questions asked by Mr. Hull. The primary fund to meet the payment of the sum "won" by the "contestant" for giving correct answers was furnished by the sponsors of the program. However, when a contestant lost his opportunity to *strike it rich* through an incorrect answer to Mr. Hull's question, it was still possible for him to obtain assistance through the "Strike It Rich Heart Fund." This fund consisted of donations and contributions of money furnished by viewers of the program both inside and outside the studio. There is no question that the "Strike It Rich Heart Fund" exists by reason of the format of the program. The evidence produced showed that many thousands of dollars were collected and paid out to "contestants" through that "Strike It Rich Heart Fund." At all times and at the date of the trial of this action, there existed in the name of the defendant Framer, a special bank account under the title of the "Strike It Rich Heart Fund." It is from this fund that payments were made to contestants on the program when they had failed to answer Mr. Hull's questions correctly. Mr. Framer is one of the owner-producers of the program. The programs were, of course, projected for the purpose of giving the sponsor an opportunity to advertise his products during stated intermissions in the projection of the program.

Defendants argue that they did not engage in solicitation of funds because they did not use any words directly asking anyone to send in money or financial assistance of any kind whatsoever. This contention is without merit. The word "solicit" as used in the ordinance does not make any distinction between solicitations by oral conduct and solicitations by mute conduct, for when a license is obtained and a licensee uses "collection boxes or containers" (subd. e. of the ordinance) he may use them "in person" or by "placing" them in certain places under certain conditions. Obviously the placement of the container in a permitted location would be "solicitation" without anyone saying a single word. But, apart from the foregoing, in the ordinary

sense, the word " solicit " means: to approach for something; to ask for the purpose of receiving; to endeavor to obtain by asking; to importune or implore for the purpose of obtaining; to awake or incite to action by acts or conduct intended to and calculated to incite the giving. The only thing that is necessary is that the means employed for the asking of something, whether by oral or mute conduct, justify the person importuned or implored in treating the request as a serious request that such person be moved to action. The very existence of the special bank account is positive proof that such persons were seriously moved to action by the format of the " Strike It Rich " program. While the evidence does not show just what part of that fund came as a result of contributions by the studio audiences which attended those fourteen television broadcastings, that fact is immaterial, because proof of collection is unnecessary as long as solicitation exists. The existence of the special fund was offered to prove the fact of solicitation, not the result of the solicitation.

The defendants urge that inasmuch as they have the power to exclude the studio audience, the acts committed by them in the presence of such studio audience, do not constitute the solicitation of funds in a " public place." Studio 51, is a " public place " within the meaning of the current ordinance. There are various types of broadcast studios; some provide few or no facilities for the accommodation of an audience; others provide for a select audience; and others admit their audience indiscriminately. With the increase in the size of the audience, established theatres have been converted into broadcast studios. As such, they must be classified as broadcast theatres with all the characteristics of places to which the public is invited. Theatres, being affected by matters in direct relation to the public welfare, it is necessary that there be local regulation as part of the municipal government's exercise of its reserved police powers (*People ex rel. Burnham* v. *Flynn,* 189 N. Y. 180). Although the studio audience at the fourteen telecastings I viewed could have been refused admission, the sponsors, by admitting the public, converted studio 51 into a public place during the time of the telecastings, even though it contained a temporary assemblage. A public place is one to which members of the public, by general invitation, attend for reasons of entertainment, business, instruction, or the like.

The defendants argue that the Court of Appeals, by its decision in *Madison Products Co.* v. *Coler* (242 N. Y. 467, *supra*), demonstrated that only places which had characteristics as public as " streets " were intended to be " public places " within the

meaning of the term used in the ordinance. To understand the full meaning of the present ordinance we must examine it before and after the *Madison* case. Before the *Madison* case, what is now subdivision a read the same, except that it did not contain the words " in office or business buildings, by house to house canvass ". These words were inserted a few years after the *Madison* case. Subdivision a formerly provided for the procurement of a license if solicitation was to occur in these two places: " upon the streets  *  *  *  or in public places ". The *Madison* case dealt with the question of whether a factory was a public place within the meaning of the then ordinance. The City of New York argued that, since the words *other public places* appeared in a section which is now identical to subdivision e of the current ordinance and provided: " in stores, factories, shops, offices, theatres, hotels, restaurants, railway stations, ferry houses, or other public places," the use of the words *other public places* was intended to include *factories*. As to subdivision e the court said that the words *other public places* did not give a public character to such private places as *homes, private offices* and *factories*. The court did not give any private characteristics to such places as *stores, theatres, hotels, restaurants, railway stations* and *ferry houses*. The court also left room for a complete change in what it called *the underlying provision of the ordinance* contained in the then subdivision a by making this statement at pages 472–473: " It is unnecessary to consider whether the board of aldermen might not have adopted an ordinance enforcing the necessity of a license upon all persons who were engaged in the professional, commercial or general solicitation of donations *no matter where made,* for the ordinance is not based upon any such idea.*  *  *  It was doubtless the fundamental notion of the legislative body that conduct in public places was subject to regulation and also that indiscriminate solicitations in such places might be a public nuisance and danger." (Emphasis supplied.) Because of such pronouncement, the then board of aldermen did change the underlying provision (N. Y. City Record, June 14, 1928, p. 5254), by amending the statute in 1928, and which is now the ordinance involved in this case, to provide for licensing in such normally private places as " *in office or business buildings, by house to house canvass* ". To protect the public from frauds through uncontrolled solicitation of funds, for charity uses, is a proper exercise of police power. It is in the interest of both the charity giver and the party to be benefited that the interests of both be safeguarded by public regulation of the conduct of the

solicitor. While police power is hard to define, and in its broadest sense includes all legislation and almost every function of civil government and is not subject to definite limitations, it is, however, coextensive with the necessities of the case and the safeguards of public interest (*Sligh* v. *Kirkwood,* 237 U. S. 52, 58).

That brings me, now, to the question of whether the City of New York is precluded from enforcing the ordinance because of the Federal Communications Act (U. S. Code, tit. 47, ch. 5) and the *Dumont* case (*supra*). The law is settled that a State is not precluded from exercising its police powers in a matter which might have some effect upon interstate commerce until Congress has evidenced an intent to completely close the field of legislation by comprehensively legislating on the subject itself (*Sligh* v. *Kirkwood, supra; Lake Shore & Mich. South Railway* v. *Ohio,* 173 U. S. 285; *People ex rel. Hill* v. *Hesterberg,* 184 N. Y. 126, affd. *sub nom. Silz* v. *Hesterberg,* 211 U. S. 31).

In the *Sligh* case (*supra*), the Supreme Court of the United States upheld the right of the State of Florida to stop the exportation of fruit in a condition unfit for consumption on the ground that it was in the public interests of the People of the State of Florida to protect their business reputation for growing and selling good, sound fruits. The court further said (p. 60) that the State's police power might be called into play notwithstanding " by doing so interstate commerce may be *remotely* * * * affected* " (emphasis supplied). In support of that holding, it cited its earlier decision in the *Hill* case (*supra*). Concerning the *Hill* case, it wrote (p. 61) : " it was held that the State might punish the sale of imported game during the closed season in New York * * * the law being sustained upon the ground that, while foreign commerce was *incidentally affected,* the State might prohibit the sale of such game in order to protect local game during the closed season ". (Emphasis supplied.) Thus, even though interstate commerce is *remotely affected* or *incidentally affected,* the State may exercise its police powers — if, of course, the Federal Government has not specifically covered the subject in question. Although the televised program might even be *remotely affected* or *incidentally affected* by requiring defendants to obtain a license before soliciting funds in the presence of a studio audience, that, according to the afore-mentioned authorities, is not enough to preclude the City of New York from exercising its police powers in that regard.

In the *Lake Shore* case (*supra*), we find even a stronger authority for the complainant's position. There the Supreme Court of the United States sustained the power of the State of Ohio to enforce a local regulation affecting a railway carrying interstate commerce through that State, by enforcing a regulation affecting the transit of the railway through that State. Numerous authorities were there reviewed, all demonstrating the fundamental rule that a State may exercise its legitimate police power to secure the well-being of its own citizens even though in doing so it may be intruding upon the domain of Federal jurisdiction. The power to do so exists until Congress closes the field by legislating comprehensively.

In the field of labor-management, as it affects interstate commerce, the National Labor Relations Act (U. S. Code, tit. 29, ch. 7) is supposed to be comprehensive legislation. Our own Court of Appeals in *Goodwins, Inc.,* v. *Hagedorn* (303 N. Y. 300), said that the State could exercise its own police power even though the exercise thereof affected interstate commerce, where the question was not covered by the National Labor Relations Act. While it might be argued that the determination made in the *Goodwins* case may be subject to attack by reason of the later case of *Garner* v. *Teamsters Union* (346 U. S. 485) — it is clear that in the *Garner* case, the Supreme Court of the United States held that a State might exercise its police power even though in doing so it might be encroaching upon Federal jurisdiction over interstate commerce.

Notwithstanding the statement made in the *Dumont* case (184 F. 2d 153, *supra*), to the effect that Congress allegedly pre-empted the field of television, I find nothing in the Federal statute, or in the decisions of the Supreme Court of the United States which precludes State action merely because the defendants are engaged in interstate commerce in the presence of the studio audience. There is no Federal statute or regulation governing the relations between sponsors and a studio audience. That relationship is purely a matter of local concern. It is not a necessary phase of the transit of the program. The exercise of local police powers in reference to it does not impair the telecasting of the program over the airwaves to home viewers. (*Regents* v. *Carroll,* 338 U. S. 586.)

The defendants further argue that the enforcement of this ordinance constitutes an impairment of rights guaranteed to them by the First and Fourteenth Amendments of the Federal Constitution. No right of free speech is affected by the requirement that the defendants procure a license to engage in solicita-

tion (*Thomas* v. *Collins,* 323 U. S. 516). The defendant, Framer, has acknowledged in his brief that the solicitation of funds would not be an impairment of his constitutional rights if he had engaged in expressed solicitation. He attempts to make a distinction between implied or mute conduct and express conduct. I find that there is no such distinction in the case. Having engaged in solicitation, the defendants entered a realm where a reasonable registration or identification may be imposed. I find that the present ordinance is a reasonable one.

I find that the defendants, Walter Framer and Warren Hull, by their conduct and actions in relation to the studio audience that was present during the presentation of the television shows violated the provisions of section 603–11.0 of chapter 24 of the Administrative Code of the City of New York.