**STATE** *of Maine*

v.

**UNIVERSITY OF MAINE.**

Supreme Judicial Court of Maine.

June 30, 1970.

Garth K. Chandler, Asst. Atty. Gen., Augusta, for plaintiff.

Henry Geller, Gen. Counsel, John H. Conlin, Associate Gen. Counsel, Katrina Renouf, Atty., F. C. C., Washington, D. C., for amicus curiae.

Bernstein, Shur, Sawyer & Nelson, by Barnett I. Shur, Gregory A. Tselikis, Portland, for defendant.

Before WILLIAMSON, C. J., and WEBBER, MARDEN, DUFRESNE, WEATHERBEE and POMEROY, JJ.

WEBBER, Justice.

This action is intended by the parties to constitute a test case to ascertain the limits

of enforceability of 20 M.R.S.A., Sec. 2606, if any there be. Plaintiff seeks injunctive relief. Sec. 2606 was enacted in 1963 and has not heretofore been scrutinized by this Court. The section provides:

"None of the facilities, plant or personnel of any educational television system which is supported in whole or in part by state funds shall be used directly or indirectly for the promotion, advertisement or advancement of any political candidate for any municipal, county, state or federal office or for the purpose of advocating or opposing any specific program, existing or proposed, of governmental action which shall include, but shall not be limited to, constitutional amendments, tax referendums or bond issues. Any person convicted of a violation of any provision of this section shall be punished by a fine of not more than $5,000 or by imprisonment for not more than 11 months, or by both."

The matter comes before us on report on the following agreed statement of facts:

"1. The University of Maine operates the State Educational Television System.

2. Operation of the system by the University of Maine is authorized under the terms of 20 M.R.S.A. § 2605.

3. Said system consists of state-wide transmission and microwave facilities, microwave interconnection with Eastern Educational Network, Boston, studio facilities in Orono, a staff of engineers, a general manager, clerical personnel, reporters, commentators and the like. The facilities were financed through a State bond issue as provided by the Private and Special Laws, Chapter 247, 1961.

4. Costs of operation of the system are paid in part by funds from the Federal Government and in part by funds from the State of Maine, appropriated to the University of Maine and allocated by the University of Maine to State Educational Television System.

5. The University of Maine is the holder of various licenses issued by the Federal Communications Commission to operate non-commercial educational broadcasting stations pursuant to the Communications Act of 1934, and all regulations made thereunder by the Federal Communications Commission. Attached hereto and made a part hereof are copies of the licenses and renewals for Station WMEB–TV with station location at Orono, Maine; Station WMED–TV with station location at Calais, Maine; WMEM–TV with station location at Presque Isle, Maine.

6. Pursuant to said licenses, Stations WMEB–TV, WMED–TV, and WMEM–TV broadcast programs in interstate communication or transmission within the meaning of USCA Title 47, § 153(e).

7. The University of Maine, as licensee of the several stations, is affiliated with and purchases programs originating in states other than the State of Maine from a variety of national broadcasting systems such as, but not limited to, the Public Broadcasting Service (PBS); National Educational Television (NET); the Eastern Educational Television Network (EETN); National Association of Educational Broadcasters, ETS Program Service, National Program Syndicators, including NBC; Showcorporations, Inc.; National Telefilm Associates.

8. That the University of Maine's broadcasting signals reach into northerly and easterly Maine and into New Brunswick, Canada.

9. In the eastern part of Washington County, specifically in the Eastport-Calais area, the University's educational broadcast television signal is the only such signal generally available which does not require the payment of any fee by viewers.

10. For the fiscal year 1969–1970, the University of Maine has budgeted ap-

proximately $420,322.00 for the operation of the State Educational Television System.

11. Monies so appropriated and budgeted have been regularly expended in the normal course of business for the operation of the State Educational Television System.

12. On April 28, 1970, beginning at approximately 7:05 P.M., the University of Maine did cause to be broadcast over the system a program which consisted of comments of one State Senator Robert Stuart of Brunswick, Maine. Said State Senator is an active and legally qualified candidate for the office of United States Representative for the First District.

13. Said program lasted approximately forty (40) minutes and more specifically consisted of the candidate answering questions telephoned in by the public. The State Educational Television Station accepted the calls on a collect basis. A transcript of said program is attached hereto and made a part hereof.

14. On May 5, 1970 and May 7, 1970 regularly thereafter, the University of Maine intended and still so intends to further use the system for similar political interviews by candidates for publc office."

At the outset the defendant contends that Sec. 2606 stands in direct conflict with the Federal Communications Act of 1934 as amended and with regulations promulgated by the Federal Communications Commission thereunder. Defendant directs our attention specifically to 47 U.S.C., Sec. 315(a) which provides:

"If any licensee shall permit any person who is a legally qualified candidate for any public office to use a broadcasting station, he shall afford equal opportunities to all other such candidates for that office in the use of such broadcasting station: *Provided*, That such licensee shall have no power of censorship over the material broadcast under the provisions of this section. No obligation is imposed upon any licensee to allow the use of its station by any such candidate. Appearance by a legally qualified candidate on any—

(1) bona fide newscast,

(2) bona fide news interview,

(3) bona fide news documentary (if the appearance of the candidate is incidental to the presentation of the subject or subjects covered by the news documentary), or

(4) on-the-spot coverage of bona fide news events (including but not limited to political conventions and activities incidental thereto),

shall not be deemed to be use of a broadcasting station within the meaning of this subsection. *Nothing in the foregoing sentence shall be construed as relieving broadcasters,* in connection with the presentation of newscasts, news interviews, news documentaries, and on-the-spot coverage of news events, *from the obligation imposed upon them* under this chapter *to operate in the public interest and to afford reasonable opportunity for the discussion of conflicting views on issues of public importance."* (Emphasis ours)

In effect the defendant asserts that with respect to political censorship of television programs, Congress has preempted the field and the Supremacy Clause of the Constitution of the United States becomes applicable and controlling. The second clause of Article VI states, "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; * * * shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

Where, as here, Congress has not seen fit to make a clear declaration of federal supremacy in the communications

field, we look to the existence of conflict as between applicable state and federal law. The conflict test was enunciated in Florida Lime and Avocado Growers, Inc. v. Paul (1963) 373 U.S. 132, 141, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248. Is there such actual conflict between the two schemes of regulation that both cannot stand in the same area? Is there evidence of a congressional design to preempt the field? Federal exclusion of state law is inescapable if compliance with both federal and state regulations is impossible.

The broad and unambiguous prohibition of Sec. 2606 precludes defendant licensee from presenting a political candidate on one of its programs and thereby enabling him to use its facilities, "directly or indirectly," for his "promotion, advertisement or advancement." Moreover, the licensee may not present any person who engages in "advocating or opposing any specific program, existing or proposed, of governmental action." In today's world nearly all important political and social issues are the subject of either "existing or proposed" programs of "governmental action." Thus, obedience to the statute would deprive licensee's viewers of any informational programs of this nature.

In contrast, the requirements which the defendant must meet in order to retain and renew its license include the furnishing of a reasonable and adequate number of programs of the very nature prohibited by Sec. 2606. This becomes apparent upon examination of the several pertinent sections of 47 U.S.C. and the judicial interpretation of them. Sec. 307 requires that the station operator be licensed by the Commission. The criterion for Commission action as stated in that section is "public convenience, interest, or necessity." The "public interest" standard has been the primary guiding principle since federal regulation was instituted in 1927. National Broadcasting Co. v. United States (1943) 319 U.S. 190, 217, 63 S.Ct. 997, 1009, 87 L. Ed. 1344.

Sec. 326 specifically denies to the Commission the power of censorship. It is understandable that it would be argued that this limitation on Commission power left the states free to censor the programs of the stations within their borders. The fallacy of this argument was established in the often cited case of Allen B. Dumont Labs. v. Carroll (1949) D.C.Pa., 86 F.Supp. 813, affd. 184 F.2d 153, cert. den. 340 U.S. 929, 71 S.Ct. 490, 95 L.Ed. 670. The Court was of the view that when Sec. 326 forbade Commission censorship, that did not mean that the states were left free to censor, since Congress had fully occupied the field. Although there will be no censorship in advance of a program showing, the Commission can take into account program content and misuse of facilities through license control. The Court concluded that state power to censor is ousted. Although some limitations have been subsequently imposed upon the *Dumont* holding, these limitations are narrowly defined. For example, in Head v. New Mexico Board (1963) 374 U.S. 424, 83 S.Ct. 1759, 10 L. Ed.2d 983 the Court held that the states had not been ousted from control in an area of such fundamentally local concern as public health.

That the states are ousted generally in the area of censorship is fully supported in Farmers Educational and Co-op. Union v. WDAY (1959) 360 U.S. 525, 527, 529, 79 S.Ct. 1302, 1304, 1305, 3 L.Ed.2d 1407. In that case a candidate demanded his right to reply to other candidates for the same office who had previously broadcast speeches over defendant's facilities. Deeming that it was so required by Sec. 315, the station afforded the time and declined to censor the speech. As a result the station was sued for libel. A divided Court held that Sec. 315 impliedly afforded defendant immunity from the results of a libel it was powerless to prevent. We note with particular interest two statements found in the opinion which we deem relevant to the instant case.

"The term censorship, however, as commonly understood, connotes *any* examination of thought or expression in order to prevent publication of 'objectionable' material."

\* \* \* \* \* \*

"\* \* \* it is obvious that permitting a broadcasting station to censor allegedly libelous remarks would undermine the basic purpose for which § 315 was passed—full and unrestricted discussion of political issues by legally qualified candidates."

The Court concluded that facilities are to be made available to candidates and that such candidates are not to be hampered as to the issues to be discussed. Stations cannot avoid the issue by denying the use of their facilities to *all* candidates for such a course of conduct would defeat the public service criterion. It is significant that Mr. Justice Frankfurter, writing for the dissenting Justices, was of the view that the states had not been ousted from traditional control of libel. Nevertheless, he was in accord with the majority as to the essential elements of compliance with the "public interest" requirement and concluded only that if the state law of libel did not prohibit stations from airing speeches by political candidates, there was no conflict between applicable state and federal law. It is apparent that on the basis of both the majority and minority views, the complete prohibition found in our Sec. 2606 would create the conflict which leads to federal supremacy.

In Radio Station WOW v. Johnson (1945) 326 U.S. 120, 131, 65 S.Ct. 1475, 1482, 89 L.Ed. 2092 the Court determined the the the Federal Communications Act does not oust the states of power to deal with fraud, even though the results affect the premises of a licensee.

The very recent case of Red Lion Broadcasting Co. v. FCC (1969) 395 U.S. 367, 380, 382, 390, 393, 89 S.Ct. 1794, 1801, 1802, 1806, 1808, 23 L.Ed.2d 371, although dealing primarily with the "fairness doctrine," contains language which emphasizes the importance and clarifies the meaning of the "public interest" standard. We quote at length as follows:

"\* \* \* the fairness doctrine inhered in the public interest standard. \* \* \*

"\* \* \* the public interest language of the Act authorized the Commission to require licensees to use their stations for discussion of public issues \* \* \*.

\* \* \* \* \* \*

"But the people as a whole retain their interest in free speech by radio and their collective right to have the medium function consistently with the ends and purposes of the First Amendment. It is the right of the viewers and listeners, not the right of the broadcasters, which is paramount. \* \* \* It is the purpose of the First Amendment to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail, rather than to countenance monopolization of that market, whether it be by the Government itself or a private licensee. \* \* \* '[S]peech concerning public affairs is more than self-expression; it is the essence of self-government." \* \* It is the right of the public to receive suitable access to social, political, esthetic, moral, and other ideas and experiences which is crucial here. That right may not constitutionally be abridged either by Congress or by the FCC. \* \* \*

"\* \* \* if present licensees should suddenly prove timorous, the Commission is not powerless to insist that they give adequate and fair attention to public issues. \* \* \* To condition the granting or renewal of licenses on a willingness to present representative community views on controversial issues is consistent with the ends and purposes of those constitutional provisions forbidding the abridgement of freedom of speech and freedom of the press."

On the basis of the foregoing authorities and the principles and guidelines enunciated therein, we construe Sec. 315(a) as permitting the licensee to deny the use of his facilities to *particular* candidates who may request the use thereof, save only when such candidate is entitled as of right to "equal opportunities" under the fairness doctrine enunciated therein. However, this does not mean, as we have seen, that the licensee may deny the use of facilities to *all* candidates, for such a policy would violate the "public interest" standard and jeopardize the license. That standard, stated in the last sentence of the paragraph, is imposed as an "obligation" and includes the affording of a "reasonable opportunity for the discussion of conflicting views on issues of public importance." In short, although the licensee is left with the power of selectivity (within the limits imposed by the fairness doctrine) as to *what* candidates and *what* public issue programs it will present, it must always be in a position to satisfy the F.C.C. that it has during the course of the license year devoted an adequate and reasonable proportion of its program offerings to significant public and political issues. The price of failure in this respect might well be loss of license. A state law which effectively prevents the licensee from discharging this "public interest" obligation and thereby satisfying the license requirement cannot stand.

Sec. 326 specifically deprives the Commission of the power of censorship and Sec. 398 in express terms forbids any form of federal control over educational television broadcasting. As noted above, however, these safeguards against federal control of program and personnel cannot be deemed to enlarge the power of the states to censor. The power to license in the "public interest" remains federally located.

Sec. 399 provides:

"No noncommercial educational broadcasting station may engage in editorializing or may support or oppose any candidate for political office."

Whether or not this provision violates First Amendment principles need not concern us here. There is no suggestion that defendant has engaged or proposes to engage in either of the proscribed activities. Defendant has thus far remained objectively neutral as between candidates and with respect to public, controversial issues.

Although Secs. 390–399 inclusive relate only to educational television broadcasting, nothing in the Act suggests that other sections, where applicable, will not be enforced upon noncommercial as well as commercial licensees. Such appears to be the intendment of that portion of Sec. 398 which states, "Nothing contained in sections 390–399 of this title shall be deemed (1) to amend any other provision of, or requirement under this chapter."

The State directs attention to the fact that defendant's television activities are in part funded by the State. The argument then advanced, as we understand it, rests upon the theory that the State's police power and resulting right to control defendant's program offerings are somehow enlarged by this public funding. The State offers no authority in support of this novel position and our own research discloses none. We think the law is otherwise.

We conclude that the "public interest" standard is as binding upon noncommercial licensees as it is upon those who operate for profit. The designation of their licensed activities as *"educational television broadcasting"* would indeed be a misnomer if state law could effectively preclude them from presenting programs which are by their very nature essential to the educational process. In our view, although the State has a valid surviving power to protect its citizens in matters involving their health and safety or to protect them from fraud and deception, it has no such valid interest in protecting them from the dissemination of ideas as to which they may be called upon to make an informed choice. In the latter area, Congress has preempted the field. As already

noted, it would be impossible for the defendant to obey the rigid censoring requirements of the Maine statute and at the same time satisfy the "public interest" standard requisite for F.C.C. licensing. We conclude that 20 M.R.S.A., Sec. 2606 violates the provisions of Article VI, Cl. 2 of the Constitution of the United States and is therefore unenforceable. In the light of this decision it becomes unnecessary to discuss other issues raised in this proceeding.

The entry will be

Judgment for the defendant.