# FARMERS EDUCATIONAL & COOPERATIVE UNION OF AMERICA, NORTH DAKOTA DIVISION, *v.* WDAY, INC.

No. 248.   Argued March 23, 1959.—Decided June 29, 1959.

*Edward S. Greenbaum* and *Harriet F. Pilpel* argued the cause for petitioner. With them on the brief were *Morris L. Ernst, Nancy F. Wechsler* and *Charles F. Brannan.*

*Harold W. Bangert* argued the cause and filed a brief for respondent.

*Douglas A. Anello* argued the cause for the National Association of Broadcasters, as *amicus curiae,* urging affirmance. With him on the brief was *Walter R. Powell, Jr.*

*Herbert Monte Levy* filed a brief for the American Civil Liberties Union, as *amicus curiae,* urging affirmance.

Solicitor General *Rankin*, *Ralph S. Spritzer*, *Richard A. Solomon* and *John L. Fitzgerald* were on a memorandum for the United States, as *amicus curiae*.

MR. JUSTICE BLACK delivered the opinion of the Court.

We must decide whether § 315 of the Federal Communications Act of 1934 bars a broadcasting station from removing defamatory statements contained in speeches broadcast by legally qualified candidates for public office, and if so, whether that section grants the station a federal immunity from liability for libelous statements so broadcast. Section 315 reads:

"(a) If any licensee shall permit any person who is a legally qualified candidate for any public office to use a broadcasting station, he shall afford equal opportunities to all other such candidates for that office in the use of such broadcasting station: *Provided,* That such licensee shall have no power of censorship over the material broadcast under the provisions of this section. No obligation is imposed upon any licensee to allow the use of its station by any such candidate."[1]

This suit for libel arose as a result of a speech made over the radio and television facilities of respondent, WDAY, Inc., by A. C. Townley—a legally qualified candidate in the 1956 United States senatorial race in North Dakota. Because it felt compelled to do so by the requirements of § 315, WDAY permitted Townley to broadcast his speech, uncensored in any respect, as a reply to previous speeches made over WDAY by two other senatorial candidates. Townley's speech, in substance, accused his opponents, together with petitioner, Farmers Educational and Cooperative Union of America, of conspiring to "establish

---

[1] 48 Stat. 1088, as amended, 47 U. S. C. § 315 (a). See also, § 18 of the Radio Act of 1927, 44 Stat. 1170.

a Communist Farmers Union Soviet right here in North Dakota." Farmers Union then sued Townley and WDAY for libel in a North Dakota State District Court. That court dismissed the complaint against WDAY on the ground that § 315 rendered the station immune from liability for the defamation alleged. The Supreme Court of North Dakota affirmed, stating: "Section 315 imposes a mandatory duty upon broadcasting stations to permit all candidates for the same office to use their facilities if they have permitted one candidate to use them. Since power of censorship of political broadcasts is prohibited it must follow as a corollary that the mandate prohibiting censorship includes the privilege of immunity from liability for defamatory statements made by the speakers." For this reason it held that the state libel laws could not apply to WDAY. 89 N. W. 2d 102, 110. We granted certiorari because the questions decided are important to the administration of the Federal Communications Act. 358 U. S. 810.

## I.

Petitioner argues that § 315's prohibition against censorship leaves broadcasters free to delete libelous material from candidates' speeches, and that therefore no federal immunity is granted a broadcasting station by that section. The term censorship, however, as commonly understood, connotes *any* examination of thought or expression in order to prevent publication of "objectionable" material. We find no clear expression of legislative intent, nor any other convincing reason to indicate Congress meant to give "censorship" a narrower meaning in § 315. In arriving at this view, we note that petitioner's interpretation has not generally been favored in previous considerations of the section. Although the first, and for years the only judicial decision dealing with the censorship provision did hold that a station may remove

defamatory statements from political broadcasts,[2] subsequent judicial interpretations of § 315 have with considerable uniformity recognized that an individual licensee has no . such power.[3] And while for some years the Federal Communications Commission's views on this matter were not clearly articulated,[4] since 1948 it has continuously held that licensees cannot remove allegedly libelous matter from speeches by candidates.[5] Similarly, the legislative history of the measure both prior to its first enactment in 1927, and subsequently, shows a deep hostility to censorship either by the Commission or by a licensee.[6]

---

[2] *Sorensen* v. *Wood*, 123 Neb. 348, 243 N. W. 82. Following this decision the case was remanded for a new trial. Appeal from a judgment for plaintiff was dismissed by the Supreme Court of Nebraska. Appeal to this Court was dismissed *sub nom. KFAB Broadcasting Co.* v. *Sorensen*, 290 U. S. 599, because, as the records of this Court disclose, the Supreme Court of Nebraska's holding had been based on adequate state grounds, namely, that the case had become moot through settlement.

[3] See *Lamb* v. *Sutton*, 164 F. Supp. 928; *Yates* v. *Associated Broadcasters, Inc.*, 7 Pike and Fischer Radio Reg. 2088; *Felix* v. *Westinghouse Radio Stations, Inc.*, 89 F. Supp. 740, rev'd on other grounds, 186 F. 2d 1; *Charles Parker Co.* v. *Silver City Crystal Co.*, 142 Conn. 605, 116 A. 2d 440; *Josephson* v. *Knickerbocker Broadcasting Co.*, 179 Misc. 787, 38 N. Y. S. 2d 985. But see *Daniell* v. *Voice of New Hampshire, Inc.*, 10 Pike and Fischer Radio Reg. 2045; *Houston Post Co.* v. *United States*, 79 F. Supp. 199.

[4] See *In re Bellingham Broadcasting Co.*, 8 F. C. C. 159, 172.

[5] *In re Port Huron Broadcasting Co.*, 12 F. C. C. 1069; *In re WDSU Broadcasting Corp.*, 7 Pike and Fischer Radio Reg. 769; Public Notice (FCC 54–1155), Use of Broadcast Facilities by Candidates For Public Office, 19 Fed. Reg. 5948, 5951; Public Notice (FCC 58–936), Use of Broadcast Facilities by Candidates For Public Office, 23 Fed. Reg. 7817, 7820–7821.

[6] See S. Rep. No. 1567, 80th Cong., 2d Sess. 13–14 (1948), where, discussing S. 1333, the Committee Report stated:

"The flat prohibition against the licensee of any station exercising any censorship authority over any political or public question dis-

More important, it is obvious that permitting a broadcasting station to censor allegedly libelous remarks would undermine the basic purpose for which § 315 was passed—full and unrestricted discussion of political issues by legally qualified candidates. That section dates back to, and was adopted verbatim from, the Radio Act of 1927. In that Act, Congress provided for the first time a comprehensive federal plan for regulating the new and expanding art of radio broadcasting. Recognizing radio's potential importance as a medium of communication of political ideas, Congress sought to foster its broadest possible utilization by encouraging broadcasting stations to make their facilities available to candidates for office without discrimination, and by insuring that these candidates when broadcasting were not to be hampered by censorship of the issues they could discuss. Thus, expressly applying this country's tradition of free expression to the field of radio broadcasting, Congress has from the

---

cussion is retained and emphasized. This means that the Commission cannot itself or by rule or regulation require the licensee to censor, alter, or in any manner affect or control the subject matter of any such broadcast and the licensee may not in his own discretion exercise any such censorship authority. . . .

"[S]ection 326 of the present act, which deals with the question of censorship of radio communications by the Commission . . . makes clear that the Commission has absolutely no power of censorship over radio communications and that it cannot impose any regulation or condition which would interfere with the right of free speech by radio."

And see, e. g., H. R. Rep. No. 404, 69th Cong., 1st Sess. 17–18 (minority views); S. Rep. No. 772, 69th Cong., 1st Sess. 4; 67 Cong. Rec. 5480, 5484, 12356; 78 Cong. Rec. 10991–10992; Hearings before Senate Committee on Interstate Commerce on S. 1 and S. 1754, 69th Cong., 1st Sess., pt. 2, 121, 125–134; Hearings before Senate Committee on Interstate Commerce on H. R. 7716, 72d Cong., 2d Sess., pt. 2, 9–13; Hearings before Senate Committee on Interstate Commerce on S. 814, 78th Cong., 1st Sess. 59–68, 943–945.

first emphatically forbidden the Commission to exercise any power of censorship over radio communication.[7] It is in line with this same tradition that the individual licensee has consistently been denied "power of censorship" in the vital area of political broadcasts.

The decision a broadcasting station would have to make in censoring libelous discussion by a candidate is far from easy. Whether a statement is defamatory is rarely clear. Whether such a statement is actionably libelous is an even more complex question, involving as it does, consideration of various legal defenses such as "truth" and the privilege of fair comment. Such issues have always troubled courts. Yet, under petitioner's view of the statute they would have to be resolved by an individual licensee during the stress of a political campaign, often, necessarily, without adequate consideration or basis for decision. Quite possibly, if a station were held responsible for the broadcast of libelous material, all remarks evenly faintly objectionable would be excluded out of an excess of caution. Moreover, if any censorship were permissible, a station so inclined could intentionally inhibit a candidate's legitimate presentation under the guise of lawful censorship of libelous matter. Because of the time limitation inherent in a political campaign, erroneous decisions by a station could not be corrected by the courts promptly enough to permit the candidate to bring improperly excluded matter before the public. It follows from all this that allowing censorship, even of the attenuated type advocated here, would almost inevitably force a candidate to avoid controversial issues during political debates over radio and television, and hence restrict the coverage of consideration relevant to intelli-

---

[7] § 29 of the Radio Act of 1927, 44 Stat. 1172; § 326 of the Communications Act of 1934, 48 Stat. 1091, as amended, 47 U. S. C. § 326.

gent political decision. We cannot believe, and we certainly are unwilling to assume, that Congress intended any such result.

## II.

Petitioner alternatively argues that § 315 does not grant a station immunity from liability for defamatory statements made during a political broadcast even though the section prohibits the station from censoring allegedly libelous matter. Again, we cannot agree. For under this interpretation, unless a licensee refuses to permit any candidate to talk at all, the section would sanction the unconscionable result of permitting civil and perhaps criminal liability to be imposed for the very conduct the statute demands of the licensee. Accordingly, judicial interpretations reaching the issue have found an immunity implicit in the section.[8] And in all those cases concluding that a licensee had no immunity, § 315 had been construed—improperly as we hold—to permit a station to censor potentially actionable material.[9] In no case has a court even implied that the licensee would not be rendered immune were it denied the power to censor libelous material.

Petitioner contends, however, that the legislative history of § 315 shows that Congress did not intend to grant an immunity. Some of the history supports such an inference. As it reached the Senate, the provision which became § 18 of the Radio Act of 1927 provided in part that if a station permitted one candidate to use its facilities, it

---

[8] *Lamb* v. *Sutton; Yates* v. *Associated Broadcasters, Inc.; Josephson* v. *Knickerbocker Broadcasting Co., supra,* note 3. Cf. *Felix* v. *Westinghouse Radio Stations, Inc.; Charles Parker Co.* v. *Silver City Crystal Co., supra,* note 3.

[9] *Houston Post Co.* v. *United States, supra,* note 3; *Sorensen* v. *Wood, supra,* note 2; *Daniell* v. *Voice of New Hampshire, Inc., supra,* note 3.

should "be. deemed a common carrier in interstate commerce . . ." and could not discriminate against other political candidates or censor material broadcast by them.[10] . In the Senate, Senator Dill—the bill's floor manager—introduced an amendment to this provision which, among other things, specifically granted a station immunity from civil and criminal liability for "any uncensored utterances thus broadcast."[11] The amendment was adopted by the Senate, but its provision expressly granting immunity was removed by the Conference Committee without any explanation.[12] Section 18 was incorporated into the Communications Act of 1934 with no explanatory discussion. Subsequently, a great deal of pressure built up for legislation to remove all possible doubt as to broadcasters' liability for libel either by granting them a power to censor libelous statements or by providing an express legislative immunity. Many legislative proposals were made to accomplish these purposes,[13] but no legislation providing either was ever enacted. Thus, whatever adverse inference may be drawn from the failure of Congress to legislate an express immunity is offset by its refusal to permit stations to avoid liability by censoring broadcasts. And more than balancing any adverse inferences drawn from congressional failure

---

[10] H. R. 9971, 69th Cong., 1st Sess., as reported to the full Senate, May 6, 1926, p. 50, § 4.

[11] 67 Cong. Rec. 12501.

[12] H. R. Rep. No. 1886, 69th Cong., 2d Sess. 10, 18.

[13] See, e. g., H. R. 9230, 74th Cong., 1st Sess.; S. 814, 78th Cong., 1st Sess., §§ 7, 9, 10, 11; S. 1333, 80th Cong., 1st Sess., § 15; 98 Cong. Rec. 7401. See also Hearings before the Senate Committee on Interstate Commerce on H. R. 7716, 72d Cong., 2d Sess., pt. 2, 9–11; Hearings before Senate Committee on Interstate Commerce on S. 2910, 73d Cong., 2d Sess. 63–67; Hearings before Senate Committee on Interstate Commerce on S. 814, 78th Cong., 1st Sess. 59–68, 162–163, 362–381, 943–945; Hearings before Select Committee of the House to Investigate the FCC, pursuant to H. Res. No. 691, 80th Cong., 2d Sess. 1–109.

to legislate an express immunity is the fact that the Federal Communications Commission—the body entrusted with administering the provisions of the Act—has long interpreted § 315 as granting stations an immunity.[14] Not only has this interpretation been adhered to despite many subsequent legislative proposals to modify § 315, but with full knowledge of the Commission's interpretation Congress has since made significant additions to that section without amending it to depart from the Commission's view.[15] In light of this contradictory legislative background we do not feel compelled to reach a result which seems so in conflict with traditional concepts of fairness.

Petitioner nevertheless urges that broadcasters do not need a specific immunity to protect themselves from liability for defamation since they may either insure against any loss, or in the alternative, deny all political candidates

---

[14] See note 5, *supra*. In *Port Huron* only two of the five Commissioners participating in the decision expressly concluded that § 315 barred state prosecutions for libel. Two of the others expressed no view on the subject. And one dissented. The Commission's 1948 report to Congress stated, however, that the Commission had interpreted § 315 to grant a federal immunity. 14 F. C. C. Ann. Rep. 28 (1948). And in *WDSU*, released November 26, 1951, a majority of the Commission affirmed the Commission's *Port Huron* decision. 7 Pike and Fischer Radio Reg. 769. See also 24 F. C. C. Ann. Rep. 123 (1958); *Lamb* v. *Sutton, supra*, note 3, at 932–933; *Daniell* v. *Voice of New Hampshire, Inc., supra*, note 3, at 2047; *Charles Parker Co.* v. *Silver City Crystal Co., supra*, note 3, 142 Conn., at 619, 116 A. 2d, at 446.

[15] The Commission's position with respect to § 315 was not only reported to Congress in an Annual Report of the Commission, 14 F. C. C. Ann. Rep. 28 (1948), but it was made the subject of a special investigation by a Select Committee of the House, expressly constituted for that purpose. See H. R. Rep. No. 2461, 80th Cong., 2d Sess. See also *In re WDSU Broadcasting Corp., supra*, note 5, at 772–773. Compare H. R. Rep. No. 2426, 82d Cong., 2d Sess. 20–21. For examples of legislative proposals to modify § 315 see, *e. g.*, S. 2539, 82d Cong., 2d Sess.; H. R. 4814, 84th Cong., 1st Sess.

use of station facilities.[16]   We have no means of know-
ing to what extent insurance is available to broad-
casting stations, or what it would cost them.   Moreover,
since § 315 expressly prohibits stations from charging
political candidates higher rates than they charge for
comparable time used for other purposes, any cost of
insurance would probably have to be absorbed by the
stations themselves.   Petitioner's reliance on the stations'
freedom from obligation "to allow use of its station by
any such candidate," seems equally misplaced.   While
denying all candidates use of stations would protect
broadcasters from liability, it would also effectively
withdraw political discussion from the air.   Instead the
thrust of § 315 is to facilitate political debate over radio
and television.   Recognizing this, the Communications
Commission considers the carrying of political broadcasts
a public service criterion to be considered both in license
renewal proceedings, and in comparative contests for a
radio or television construction permit.[17]   Certainly Con-
gress knew the obvious—that if a licensee could pro-

---

[16] A dissent here suggests that since WDAY's broadcast was
required by federal law, there is a "strong likelihood" that the North
Dakota courts might hold that the broadcast was not tortious under
state law, or if tortious, was privileged.   The North Dakota District
Court, however, struck down a state statute which would have
granted WDAY an immunity as in violation of a state constitutional
provision saving to "every man" a court remedy for any injury done
his "person or reputation."   In this situation we do not think that the
record justifies the inference that WDAY could have obtained an
immunity by calling it a privilege.   But whatever North Dakota might
hold, the question for us is whether Congress intended to subject
a federal licensee to possible liability under the law of some or all
of the 49 States for broadcasting in a way required by federal law.

[17] *In re City of Jacksonville*, 12 Pike and Fischer Radio Reg. 113,
125–126, 180 i-j; *In re Loyola University*, 12 Pike and Fischer Radio
Reg. 1017, 1099.   See also *In re Homer P. Rainey*, 11 F. C. C. 898.
Cf. F. C. C. Report, *In re* Editorializing by Broadcast Licensees,
1 Pike and Fischer Radio Reg., pt. 3, 91:201.

tect himself from liability in no other way but by refusing to broadcast candidates' speeches, the necessary effect would be to hamper the congressional plan to develop broadcasting as a political outlet, rather than to foster it.[18]

We are aware that causes of action for libel are widely recognized throughout the States. But we have not hesitated to abrogate state law where satisfied that its enforcement would stand "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." [19] Here, petitioner is asking us to attribute to § 315 a meaning which would either frustrate the underlying purposes for which it was enacted, or alternatively impose unreasonable burdens on the parties governed by that legislation. In the absence of clear expression by Congress we will not assume that it desired such a result. Agreeing with the state courts of North Dakota that § 315 grants a licensee an immunity from liability for libelous material it broadcasts, we merely read § 315 in accordance with what we believe to be its underlying purpose.

*Affirmed.*

MR. JUSTICE FRANKFURTER, whom MR. JUSTICE HARLAN, MR. JUSTICE WHITTAKER and MR. JUSTICE STEWART join, dissenting.

The language of § 315 of the Federal Communications Act, "such licensee shall have no power of censorship over the material broadcast under the provisions of this section," [1] and the legislative history of this provision call for the conclusion reached in Part I of the Court's opinion, namely, that WDAY could not have lawfully deleted from

---

[18] See, *e. g.*, statement of Senator Fess, 67 Cong. Rec. 12356.

[19] *Bethlehem Steel Co.* v. *New York Labor Board,* 330 U. S. 767, 773; *Hill* v. *Florida*, 325 U. S. 538, 542. See also *San Diego Building Trades Council* v. *Garmon*, 359 U. S. 236; *California* v. *Taylor*, 353 U. S. 553.

[1] 48 Stat. 1088, as amended, 47 U. S. C. § 315 (a).

A. C. Townley's broadcast his defamation of petitioner. But due regard for the principle of separation of powers limiting this Court's functions and respect for the binding principle of federalism, leaving to the States authority not withdrawn by the Constitution or absorbed by the Congress, are more compelling considerations than avoidance of a hardship legally imposed. Consequently the claim that WDAY cannot be held liable under constitutionally enacted state libel laws must be tested not by inquiring whether a particular result would be "unconscionable" but whether the result is or is not barred by federal legislation as construed and applied in accordance with settled principles of statutory and constitutional adjudication. When the question in this case is thus properly put, it is necessary to examine the three relevant legal concepts to which resort must be had in order to find that WDAY is not liable for defamatory remarks broadcast by it.

(1) If § 315 could be construed to contain implicitly, between the lines, a grant by Congress of immunity from state libel laws, the Court's result would follow. But it is not possible to find such implied grant of immunity. It is common ground that an express provision granting such immunity was excised from the bill which later became the Radio Act of 1927 and repeated attempts in later revisions of the Act to introduce similar provisions have failed.

(2) If there were consistent administrative rulings that the Communications Act required that immunity be granted, and if that administrative ruling had been acquiesced in by Congress even by implication, the Court's result would have support.

(3) If § 315 alone, or together with the remainder of the Communications Act, could be said to manifest a congressional purpose to oust state law from application to licensees, or if the state law could be said to be in clear

conflict with § 315 or the Act as a whole, then, in either event, it could be concluded that the libel law of the State had been pre-empted insofar as its applicability to a broadcaster acting within § 315 is concerned.

Because I believe that agreement with the Court's conclusion involves either disregard of the legislative and administrative history of § 315 or departure from the principles which have governed this Court in determining when state law must give way to overriding federal law, I dissent from Part II of the opinion of the Court and therefore from its judgment.

An administrative agency cannot, of course, determine the constitutional issue whether a federal statute has displaced state law, certainly not by way of determining what Congress has in fact done. In *In re Port Huron Broadcasting Co.*, 12 F. C. C. 1069, the case in which the Federal Communications Commission first held that stations could not censor, the Federal Communications Commission's dictum that stations would not be liable was not a relevant administrative interpretation of the meaning of § 315 but was a finding that the States were pre-empted from this area. It was said, not that the broadcasters operating under § 315 had a federally created defense, but that the state libel laws had been supplanted. "The conclusion is inescapable that Congress has occupied the field in connection with responsibility for libelous matter in broadcasts under section 315 . . . ." 12 F. C. C., at 1075–1076.

We have here not a course of administrative interpretation of an ambiguous statutory provision; it is not even a case of a single administrative application of a statute. This is a ruling of constitutional law—that the Supremacy Clause requires that the existence of the Communications Act of 1934 oust the States of jurisdiction to impose libel laws upon broadcasts made under the provisions of § 315. Such constitutional rulings are for this Court and not for

administrative agencies. I would suppose that a consistent administrative insistence on the constitutionality of § 315, were that a question, would not affect this Court's consideration of its constitutionality.

But suppose that, even as to pre-emption, we are to assume that Congress should be said to defer to consistent administrative interpretation. There was no such consistency here in the FCC. The Commission has never issued a regulation nor held in an adjudicatory proceeding that there is immunity. Dictum in the *Port Huron* case was affirmatively embraced by only two of the five Commissioners who presided. Since *Port Huron* the Commission has referred to its language in that case in increasingly tentative fashion. In *In re. WDSU Broadcasting Corp.,* 7 Pike and Fischer Radio Reg. 769, 770, the FCC said of its dictum in *Port Huron:*

"We said in the Port Huron case that in our view the station was relieved from liability, but that whether or not this was the case, the fact remained that a licensee is prohibited from censoring material broadcast under the provisions of § 315."

In a regulation issued in 1958 the Commission answered the question "If a legally qualified candidate broadcasts libelous or slanderous remarks, is the station liable therefor?" in this way:

"In Port Huron Bctg. Co., 4 R. R. 1, the Commission expressed an opinion that licensees not directly participating in the libel might be absolved from any liability they might otherwise incur under state law, because of the operation of section 315, which precludes them from preventing a candidate's utterances." 23 Fed. Reg. 7820.

Thus the FCC has demonstrated apparent waning confidence in its *Port Huron* dictum—from "[t]he conclusion is inescapable" to "in our view the station was relieved

from liability, but . . . whether or not this was the case"
to "an opinion that licensees . . . might be absolved from
any liability."

Even if the FCC's position were of a type to which the
principle of deference or acquiescence were applicable,
even if that position were longer held than just the past
decade, and were taken with more confidence than was
true here, the history of congressional dealings with the
question of liability of stations for libel would not support
a conclusion that Congress had acquiesced in such a ruling.
For when the last congressional discussion of an immunity
provision took place in 1952, the Conference Committee,
in reporting oui the revised version of § 315, stated it had
rejected a House immunity provision [2]

> ". . . because these subjects have not been ade-
> quately studied by the Committees on Interstate
> and Foreign Commerce of the Senate and House
> of Representatives. The proposal was adopted in
> the House after the bill had been reported from the
> House committee. The proposal involves many dif-
> ficult problems and it is the judgment of the com-
> mittee of the conference that it should be acted on
> only after full hearings have been held." H. R. Rep.
> No. 2426, 82d Cong., 2d Sess. 21.

This language negates rather than supports the conclu-
sion that Congress in failing to enact proposed immunity
measures was in fact acquiescing in the *Port Huron*
dictum.[3]

---

[2] See 98 Cong. Rec. 7401–7416.

[3] The situation would not have appeared to Congress to be one
in which acquiescence was a meaningful concept. Immediately after
*Port Huron* the decision was criticized as being without statutory
basis. *Houston Post Co.* v. *United States,* 79 F. Supp. 199. In dis-
cussing the *Port Huron* decision before a House Committee, FCC
Chairman Coy insisted that that decision "only represents the views

For these many reasons a conclusion that in failing to change § 315 after the *Port Huron* decision Congress by its inaction effected the pre-emption which the Commission had found is an assumption wholly unsupported in fact. The attempt to use congressional acquiescence to support the constitutional ruling of supersession of state law raises political stalemate and legislative indecision [4] to the level of constitutional declaration. As we should go slow to read into what Congress has said the negation of state power, unless it speaks explicitly or there is obvious collision, we should even less willingly find such negation in what Congress has frankly refused to say.

The Court proceeds not only from an insupportable finding that Congress acquiesced in the Commission's *Port Huron* opinion. It also relies upon a determination that North Dakota's libel law could not constitutionally be applied to WDAY in this case since the State's libel

---

of the Commission" and that he did not think "this decision clarifies it as far as the industry is concerned." Hearings before House Select Committee to Investigate the Federal Communications Commission, 80th Cong., 2d Sess. 14. After *Port Huron* had been argued but before the decision, a bill, S. 1333, 80th Cong., 1st Sess., § 15, granting immunity was reported favorably by the Senate Committee on Interstate and Foreign Commerce, S. Rep. No. 1567, 80th Cong., 2d Sess. 13, but was never enacted. Every indication is persuasive that the question was regarded as open and highly debatable.

[4] Both before and after *Port Huron,* bills to permit censorship or grant total or partial immunity have been introduced. See H. R. 9230, 74th Cong., 1st Sess.; H. R. 3038, 75th Cong., 1st Sess.; S. 814, 78th Cong., 1st Sess., § 11; S. 1333, 80th Cong., 1st Sess., § 15; H. R. 3595, 80th Cong., 1st Sess., § 15; H. R. 6949, 81st Cong., 2d Sess., § 202; H. R. 5470, 82d Cong., 1st Sess.; S. 2539, 82d Cong., 2d Sess.; H. R. 7062, 82d Cong., 2d Sess.; H. R. 7756, 82d Cong., 2d Sess.; S. 1208, 84th Cong., 1st Sess.; H. R. 4814, 84th Cong., 1st Sess.; S. 1437, 85th Cong., 1st Sess., § 401. The congressional declination to act partakes not of satisfaction with the *Port Huron* decision but of indecision about the propriety and constitutionality of the alternative solutions to the broadcasters' plea of unfairness.

laws had been superseded by federal law for broadcasts made under § 315. A determination of supersession of state law rests on legal and political presuppositions which should be made explicit and not left clouded. States should not be held to have been ousted from power traditionally held in the absence of either a clear declaration by Congress that it intends to forbid the continued functioning of the state law or an obvious and unavoidable conflict between the federal and state directives. The first does not exist here. Indeed, congressional refusal to act has often been suggested as implied recognition of the opposite. Thus, it may well be urged that repeated refusal to relieve from state libel laws amounted to an affirmance that the state laws of defamation should continue in operation since the Congress debated the issue in terms of erecting a defense to these laws, and then declined to do so. In any event, the legislative history emphatically does not support the affirmative conclusion that Congress intended preclusion of state law. Congress can speak with drastic clarity when it so intends. It has not so spoken here; it has refused to speak with drastic clarity.

The nature of the conflict which necessitates striking down state law has been considered in numerous decisions of this Court. In the much-cited case of *Sinnot* v. *Davenport,* 22 How. 227, 243, this Court said:

"We agree, that in the application of this principle of supremacy of an act of Congress in a case where the State law is but the exercise of a reserved power, the repugnance or conflict should be direct and positive, so that the two acts could not be reconciled or consistently stand together."

Whether denying to WDAY the power to eliminate defamatory matter from broadcasts made under compulsion of § 315 while at the same time refusing to find in

§ 315 either immunity or a negation of state power to apply libel laws to programs required by the Federal Act is or is not fair, is not the question with which this Court must, consistent with the Supremacy Clause and the long history of this Court in construing it, begin. We are dealing with political power, not ethical imperatives. The most harmonious deduction to be drawn from the many cases in which the claim has been made that state action cannot survive some contradictory command of Congress is that state action has not been set aside on mere generalities about Congress having "occupied the field," or on the basis of loose talk instead of demonstrations about "conflict" between state and federal action. We are in the domain of government and practical affairs, and this Court has not stifled state action unless what the State has required, in the light of what Congress has ordered, would truly entail contradictory duties or make actual, not argumentative, inroads on what Congress has commanded or forbidden.

It is to be noted initially that since defamation is generally regarded as an intentional tort, it is a solid likelihood that the North Dakota courts would conclude that WDAY's compelled broadcast of Townley's speech lacked the necessary intent to communicate the defamation, and that therefore WDAY's conduct was not tortious, or, if prima facie tortious, that WDAY was privileged.[5] In no case has any state court held a station liable on finding that the station could not censor. Some forty States have enacted statutes granting various degrees of privilege.[6]

---

[5] See Developments in the Law of Defamation, 69 Harv. L. Rev. 875, 907–910; Remmers, Recent Legislative Trends in Defamation by Radio, 64 Harv. L. Rev. 727.

[6] Friedenthal and Medalie, The Impact of Federal Regulation on Political Broadcasting: Section 315 of the Communications Act, 72 Harv. L. Rev. 445, 485.

In two States, exercising the flexibility of common-law principles, the courts have extended a defense of privilege to broadcasters compelled to carry broadcasts by § 315.[7] Thus, the largely abstract assumption on the basis of which the Court makes such heavy inroad on state laws— that broadcasters will be held without having committed a volitional act—may be entirely contradicted by experience.

How treacherous it is for this Court to be speculating about state law is well illustrated by a detailed examination of North Dakota law in the situation presented by this case. A North Dakota statute extending general immunity to all broadcasts by radio and television stations was found by the District Court of North Dakota to violate the North Dakota and United States Constitutions. WDAY, the appellee before the Supreme Court of North Dakota, did not except to this finding and therefore the Supreme Court of North Dakota declined to rule on the validity of the North Dakota statute. But no inference may be drawn from the District Court's conclusions that a station broadcasting under compulsion of § 315 would be liable under North Dakota law. On the contrary, the District Court found that WDAY had a valid defense not only under § 315 of the Communications Act but also within the provisions of Chapter 14–02 of the North Dakota Revised Statutes of 1943. One section of this chapter extends a privilege to "one who stands in such relation to the person interested as to afford a reasonable ground for supposing the motive for the communication innocent." And so, rather than being justification for a belief that under North Dakota law WDAY would be liable for defamation, the District Court's opin-

---

[7] *Charles Parker Co.* v. *Silver City Crystal Co.,* 142 Conn. 605, 116 A. 2d 440; *Josephson* v. *Knickerbocker Broadcasting Co.,* 179 Misc. 787, 38 N. Y. S. 2d 985 (Sup. Ct.).

ion is clear evidence that at least one North Dakota court believed that North Dakota law creates a privilege in favor of broadcasters who are compelled by federal law to broadcast the defamatory matter. In any event, the finding of unconstitutionality was by a lower court and not by the North Dakota Supreme Court which is, of course, the final interpreter of North Dakota law.

Even granting the Court's unsupported assumption about state law, however, there is not that conflict between federal and state law which justifies displacement of state power. Conflict between the North Dakota libel law and § 315 might be attributed to the fact that broadcasters, to avoid being held liable without fault, will refrain from permitting any political candidate to buy time. This result, the argument would conclude, is contrary to the congressional command that stations operate in the "public convenience, interest, or necessity." 48 Stat. 1083, as amended, 47 U. S. C. § 307. The Federal Communications Commission has determined that to fulfill this congressional command stations must carry some political broadcasts. But the state libel laws do not prohibit them from airing speeches by political candidates. They merely make such broadcasts potentially less profitable (or unprofitable) since the station may have to compensate someone libeled during the candidate's broadcast. The Federal Act was intended not to establish a mode of supervising the income of broadcasters—not of protecting or limiting their profits—but of insuring "a rapid, efficient, Nation-wide, and world-wide wire and radio communication service" for the benefit of "all the people of the United States." 48 Stat. 1064, as amended, 47 U. S. C. § 151.

We have held that the Communications Act does not govern relations between stations and third persons. *Radio Station WOW, Inc.,* v. *Johnson,* 326 U. S. 120. And

we have permitted a state court to award damages for breach of a contract despite the fact that that breach was ordered by the FCC as a condition for renewal of a license. *Regents of the University System of Georgia* v. *Carroll,* 338 U. S. 586. If North Dakota were to rule that its libel law applies to broadcasts made under compulsion of § 315, it would rule that broadcasters are liable without fault. There is nothing in such liability which conflicts with the necessity of broadcasting imposed by § 315. If Congress came to fear impairment of its policy on political broadcasts, Congress could act to alter the condition which it has created by declining to legislate immunity. There may be a burden, even unfairness to the stations. But there may be unfairness too, after all, in depriving a defamed individual of recovery against the agency by which the defamatory communication was magnified in its deleterious effect on his ability to earn a livelihood. Adjustment of what is fair to all should be done by a congressional change in the federal law, or in the absence of such enactment, by state law, through legislation or common-law rulings that the stations are partially or totally immune. Again, allocation of risk of loss through defamation does not necessarily imply the duty not to defame. The application of libel laws by North Dakota to WDAY merely means that since the harm could no more have been avoided by the person defamed than by WDAY, in balancing these conflicting undesirables the risk of loss should fall upon WDAY. Whether or not this would be a wise decision, it would not conflict with § 315's compulsion to broadcast speeches by opposing candidates for office.

In discussing in the Federalist Papers the respective areas of federal and state constitutional powers, Hamilton wrote that state powers would be superseded by federal authority if continued authority in the States would be "absolutely and totally *contradictory* and *repugnant.*"

"I use these terms," he wrote, "to distinguish this . . . case from another which might appear to resemble it, but which would, in fact, be essentially different; I mean where the exercise of a concurrent jurisdiction might be productive of occasional interferences in the *policy* of any branch of administration, but would not imply any direct contradiction or repugnancy in point of constitutional authority." The Federalist, No. 32, at 200 (Van Doren ed. 1945). Since this concurrent jurisdiction was "clearly admitted by the whole tenor" of the Constitution in Hamilton's view, "It is not . . . a mere possibility of inconvenience in the exercise of powers, but an immediate constitutional repugnancy that can by implication alienate and extinguish a preëxisting right of sovereignty." *Id.*, at 203.

Hamilton's suggestion, emanating from the contest of constitutional creation, is disregarded in the approach taken by the Court today on a precisely analogous if not identical question, for there exists here not an explicit conflict but, at the very most, an interference with policy. Hamilton said, and this Court has in the past begun from similar presuppositions, that alienation of an area of state sovereignty is not to be implied from occasional interferences by state law with federal policy. Particularly should this rule be adhered to where the precise nature of that federal policy on the issues involved rests on the conjectures of the Court. When a state statute is assailed because of alleged conflict with a federal law, the same considerations of forbearance, the same regard for the lawmaking power of States, should guide the judicial judgment as when this Court is asked to declare a statute unconstitutional outright.

In this decision a state law is invalidated by hypothesizing congressional acquiescence and by supposing "conflicting" state law which we cannot be certain exists and

which, if it does exist, is not incompatible with federal law when judged by the considerations governing supersession in the long course of our decisions, judged as a corpus.

I would reverse the North Dakota Supreme Court and remand the case to it with instructions that § 315 has left to the States the power to determine the nature and extent of the liability, if any, of broadcasters to third persons.