2009 ND 110

Inder V. KHOKHA, Plaintiff, Appellant and Cross–Appellee

v.

Salem S. SHAHIN, and Salem S. Shahin, M.D., P.C., a North Dakota Professional Corporation, Defendants, Appellees and Cross–Appellants.

No. 20080211.

Supreme Court of North Dakota.

June 22, 2009.

Tracy Vigness Kolb (argued) and Lance D. Schreiner (appeared), Zuger Kirmis & Smith, Bismarck, N.D., for plaintiff, appellant, and cross–appellee.

Patrick W. Durick (argued) and Tiffany L. Johnson (appeared), Pearce & Durick, Bismarck, N.D., for defendants, appellees, and cross–appellants.

VANDE WALLE, Chief Justice.

[¶ 1]   Dr. Inder V. Khokha appealed and Dr. Salem S. Shahin and Salem S. Shahin, M.D., P.C., a North Dakota Professional Corporation, cross-appealed from a judgment dismissing Khokha's defamation action against Shahin after a jury found statements made by Shahin to a patient's family did not defame Khokha. We hold the district court did not abuse its discretion in its evidentiary rulings and did not err in instructing the jury on qualified privilege.   We affirm.

I

[¶ 2]   Shahin is a urologist who has practiced independently in Williston for nearly 30 years.   Khokha is a general surgeon with vascular training specializing in surgery on blood vessels.   Khokha had been a surgeon for nearly 25 years when he was recruited to Mercy Medical Center in Williston in October 2003 under an employment contract with the hospital.   At the time, Williston had two other surgeons, but neither of those surgeons had training in vascular surgery, and a community need profile projected that Williston could support three surgeons.   Shahin agreed to proctor and provide a written evaluation for Khokha's first ten surgeries at Mercy Medical Center, and according to the hospital president, there were "no issues or concerns identified" by Shahin during that period, which was completed within three months after Khokha arrived in Williston in October 2003.

[¶ 3]   Rosie Chamley had been Shahin's patient for more than 20 years, and during that time, Shahin had performed five operations on her kidneys, including four per-

cutaneous procedures to remove kidney stones.   Shahin described a percutaneous procedure as a surgical procedure in which no incision is made; rather, a needle with a guide wire, a sheath, and a nephroscope are inserted through the skin into the kidney to remove the kidney stones.   Shahin explained that after the kidney stones are removed, a catheter is inserted into the hole in the kidney to drain into a bag outside the body.

[¶ 4]   On February 2, 2004, Shahin admitted Chamley to Mercy Medical Center for a percutaneous procedure to remove kidney stones from her right kidney.   Following the percutaneous procedure, Chamley experienced excessive bleeding from the catheter, and she was returned to the operating room to stop the bleeding.   Dr. Wayne Anderson initially assisted Shahin in attempting to control Chamley's bleeding with a second surgical procedure requiring an incision.   According to Shahin, he tried to suture the hole in the kidney where the catheter had been located, but Chamley's condition deteriorated, and he eventually decided to remove her kidney. Because of scar tissue around Chamley's kidney and blood vessels, Shahin asked Khokha, who was waiting in the doctors' lounge to perform a scheduled surgery on another patient, to help remove the kidney.   After Chamley's kidney was removed, it was discovered that her vena cava was torn and was bleeding.   Khokha repaired the vena cava with a graft. Chamley's condition stabilized, and she was sent to the recovery room, but the following day she was transferred to a Bismarck hospital where she later died from complications from bleeding.

[¶ 5]   After Chamley died, her family contacted Shahin on February 15, 2004, with questions about the surgical procedures, and he met with the family at his home that evening to explain the proce-

dures to them. Accordingly to Khokha, Shahin falsely told the family that Khokha "ripped and tore the kidney out," and he "grabbed ahold of the kidney and just pulled it out ... without severing any vessels, without cutting anything just pulled it out." However, Shahin claimed he told the family that Chamley's vena cava was ripped or torn while Khokha removed the kidney. According to Khokha, Shahin tore Chamley's vena cava while applying a surgical clamp to the area near the kidney before Khokha entered the operating room.

[¶ 6] In April 2004, Shahin talked with the Chamley family's attorneys by telephone, and in October 2004, Shahin provided the attorneys with a sworn statement about the surgery. In February 2005, Chamley's family sued Khokha for malpractice, alleging Khokha "was careless and negligent in the manner in which he performed the dissection of Rosie Chamley's kidney in that ... he negligently ripped and tore the vena cava and failed to appropriately suture, graft, and repair the vena cava." Chamley's family later added Shahin as a defendant in that lawsuit. *See Chamley v. Khokha*, 2007 ND 69, 730 N.W.2d 864.

[¶ 7] While defending the Chamley family's malpractice action against him, Khokha learned that Shahin had discussed the surgical procedures with the family on February 15, 2004, and had given a sworn statement to the family's attorneys in October 2004. Khokha sued Shahin and his professional corporation for defamation, alleging Shahin made false statements to Chamley's family about the quality of Khokha's surgical assistance. Khokha alleged that in February 2004, Shahin falsely told Chamley's family that Khokha had "pulled, ripped, and tore ... Chamley's right kidney out of her and part of the vena cava came out with the kidney and

was torn and ragged." Shahin denied making any false and defamatory statements to Chamley's family.

[¶ 8] At trial, Khokha presented evidence that Chamley's kidney was not ripped or torn out of her body in the manner that Shahin allegedly described to Chamley's family and that Khokha was harmed as a result of Shahin's defamatory statements to the family. Khokha also presented evidence that his surgical practice became stagnant after Chamley's death and Mercy Medical Center terminated his employment contract in March 2006 because of "declining volumes." Shahin presented evidence to support his explanation that Khokha tore Chamley's vena cava when Khokha removed the kidney and that Khokha's reputation was not harmed as a result of Shahin's statements to the family. As relevant to the issues in this appeal, the jury also heard evidence that Khokha was arrested for DUI in February 2005; that he had a bad result in a surgical procedure on a young boy in November 2003; and that his surgical practice was subject to high rates of complications. The district court decided Shahin's statements to Chamley's family on February 15, 2004, were subject to a qualified privilege, and the jury returned a special verdict, finding those statements were not defamatory.

II

[¶ 9] Khokha argues the jury verdict is perverse and contrary to the evidence, because the jury was misled and improperly influenced by irrelevant and inadmissible evidence about his reputation. He argues Shahin incontrovertibly made false statements to Chamley's family and the verdict can only be explained by irrelevant, inadmissable, and substantially prejudicial evidence that Shahin did not harm Khokha's reputation, because Khokha was "a surgeon with an alcohol problem" who

had "extremely bad results" and "higher complication rates," whose practice was the subject of "complaints" and an "investigation" and who left Williston because of an "unresolved DUI." Khokha argues that reputation evidence was not admissible because it did not relate to the aspect of his reputation that was defamed and the evidence did not pertain to a reputation that was generally known in the community before Shahin made the defamatory statements. Khokha claims inadmissible reputation evidence tainted the trial and affected his substantial rights. Shahin responds that this Court cannot review Khokha's request for a new trial, because he failed to move for a new trial or for judgment as a matter of law in the district court. Shahin further argues substantial evidence supports the verdict and the district court did not abuse its discretion in ruling on the admissibility of reputation evidence.

[¶ 10] Although Khokha's arguments implicate the sufficiency of the evidence, they are made in the context of his arguments about the admissibility of reputation evidence and the effect of that evidence on the verdict and his substantial rights. We therefore consider his arguments in the context of the admissibility of the reputation evidence.

[¶ 11] In *Forster v. West Dakota Veterinary Clinic, Inc.*, 2004 ND 207, ¶¶ 40, 42, 689 N.W.2d 366 (citations omitted), we described standards for the admissibility of reputation evidence in the context of a defamation action and the effect of the evidence on the substantial rights of the parties:

A district court has broad discretion on evidentiary matters, and we will not overturn its admission or exclusion of evidence on appeal unless that discretion has been abused. Under N.D.R.Civ.P. 61, "[n]o error in either the admission or the exclusion of evidence ... is ground

for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice." *See also* N.D.R.Ev. 103(a) (providing "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected").

. . . .

Because the "gravamen of the tort of defamation is the injury to the plaintiff's reputation," evidence of a plaintiff's general bad reputation or bad character is admissible in a defamation action. However, specific instances of a plaintiff's conduct or a plaintiff's particular character traits are not relevant unless they were generally known by others in the community. Moreover, reputation evidence is permissible only if it affects the aspects of reputation that were defamed.

[¶ 12] Khokha claims evidence that he was arrested for DUI in 2005 had no relationship to his reputation as a vascular surgeon. He asserts there was no evidence that he had an alcohol problem, or that the 2005 DUI had any role in him leaving Williston, and the admission of that evidence prejudiced him.

[¶ 13] During opening statements to the jury, Shahin said:

Dr. Khokha is going to bring in an expert that is going to claim he was damaged in the amount of $800,000 because he didn't develop a practice here and had to leave here and go to Jamestown and he is going to blame that on Dr. Shahin. There is going to be evidence that that isn't the only reason—that isn't in my opinion the reason why Dr. Khokha left the town of Williston. In February of 2005 Dr. Khokha was arrested for DUI. And that DUI remained open,

nothing was done about it until after Dr. Khokha had already been advised that he was—had to leave Williston because in fact he wasn't producing. He started out being paid $300,000 by Williston to be here as a vascular surgeon. That didn't work out. He had to leave here and go to Jamestown. And it isn't because of anything Dr. Shahin did that Dr. Khokha had to leave Williston. That will be our position on that.

[¶ 14] At trial, Khokha attributed the decline in his surgical practice and his termination from Mercy Medical Center to Shahin's February 2004 statements to Chamley's family. According to Khokha, he began looking for a new job the summer after his February 2005 DUI arrest. Nearly one year later, in March 2006, Mercy Medical Center informed Khokha that his contract with the hospital would terminate because of his lack of surgical volume. Shahin argued Khokha's February 2005 DUI arrest could have impacted his decision to leave Mercy Medical Center and also could have contributed to the decrease in his production as a surgeon. The district court ruled that Shahin could question Khokha about his DUI arrest for the limited purpose of determining how it impacted his decision to leave Williston. On this record, we conclude the district court did not abuse its discretion in ruling that Shahin could present limited evidence that Khokha's decline in surgical production could have been caused by something other than Shahin's statements to Chamley's family and that Khokha's decision to leave Williston was influenced by his DUI arrest.

[¶ 15] Khokha nevertheless asserts Shahin misled the district court because Shahin repeatedly told the court the DUI arrest was relevant to damages and to the reason Khokha left Williston, but Shahin asked Khokha:

Q [Mr. Durick] Do you think an incident such as [the DUI arrest] would have an effect on people in the community whether or not they want to go to you as a surgeon?

MR. SCHREINER: Objection, Your Honor.

THE COURT: Basis.

MR. SCHREINER: Be speculation, I guess.

THE COURT: Overruled. You may answer, Doctor.

THE WITNESS: Whether—actually I really don't know an answer to that question because for the simple reason—and it wasn't as if I was drunk in the operating room or anything like that. I was upset about quite a few things which were going on in my life and I overdid it and I—I was smoking very heavily at that time and I—the only thing I did that night was that I ran out of cigarettes and I drove over to pick up a pack of cigarettes. On my way back, 20 yards away from my home I got stopped.

MR. DURICK: And I'm not arguing—

THE WITNESS: No, I'm giving you the facts. That's the way it happened.

BY MR. DURICK: (Continuing)

Q And the facts are, though, that somebody that sees their surgeon with alcohol—with a problem with alcohol, it doesn't do your reputation any good as far as people coming to you in the community?

A My practice wasn't really going very well at that time. This was in February of 2005. As far as I remember it happened after I was served papers for Chamley lawsuit.

[¶ 16] Khokha did not object to those questions on the grounds now asserted on appeal, nor did he request a

curative or limiting instruction. A party must make a specific objection to evidence when it is offered for admission to give the opposing party an opportunity to argue the objection and to cure any claimed deficiencies, and to give the trial court an opportunity to appropriately rule on the admissibility of the evidence. *May v. Sprynczynatyk*, 2005 ND 76, ¶ 26, 695 N.W.2d 196. A party must object when the alleged error occurs so the trial court may take appropriate action, if possible, to remedy any prejudice that may have resulted. *Id.* at ¶ 25. To the extent Khokha argues that Shahin misled the district court about the admissibility of the DUI evidence, we conclude Khokha's failure to further object when that testimony was admitted constitutes a waiver of that argument. We conclude the district court did not abuse its discretion in its ruling on the admissibility of Khokha's 2005 DUI arrest.

■ [¶ 17] Khokha argues the district court erred in admitting evidence that he had a bad result in a surgery involving a young boy. The district court decided the parent of that young boy could not testify, because Shahin had not disclosed the parent during discovery. During Shahin's opening statement to the jury, counsel said:

MR. DURICK: ... There has been an allegation as you heard that Dr. Khokha's reputation has been injured. It is not my intention to stand up and try to run somebody down but I have to defend a client and there has been a suggestion that Dr. Khokha's reputation has been injured so I have to go out and look at what Dr. Khokha's reputation was at this point in time. There is going to be evidence to that effect. Dr. Khokha came to Williston to be a vascular surgeon in October of 2003. Within a month after Dr. Khokha arrived he was called into the operating room on a Sun-

day night because there was a young boy in Williston that was in distress. They looked at him and decided that he had a hernia.

MR. SCHREINER: Your Honor, I must object to this, this is part of the Court's order that this witness not be called and this is not appropriate.

(Conference at the bench out of the hearing of the jury.)

MR. DURICK: Again, the boy was brought into the operating room on a Sunday night and Dr. Khokha was called. He operated on the young boy to fix a hiatal hernia. He sewed the intestine of the young boy shut. The next morning the young boy was not doing well at all. His mother decided she was going to take him to Bismarck. They flew the young man to Bismarck where he was operated on. A portion of his intestine was gangrenous and it was taken out. He was split from his ster[n]um to his crotch.

MR. SCHREINER: Your Honor, again this is not evidence that can be presented in opening statement.

THE COURT: Overruled. But wrap it up on this portion, Mr. Durick.

MR. DURICK: That was when he had been in the community at a time— less than a month after Dr. Khokha arrived in Williston.

[¶ 18] Thereafter, based on Shahin's representation that the parent of the young boy had talked with Chamley's family before Shahin's statements to the family on February 15, 2004, the court ruled that a member of Chamley's family could testify "to the fact that he had a conversation with [the parent], that there was a bad result. But beyond that, the specifics of the result and all that, that's out. As far as when the conversation and that occurred, we will have to find that out. You will have to ask on cross-examination or

whatever." During examination of the member of Chamley's family, the evidence established the conversation with the boy's father occurred one month after Chamley died and the court thereafter refused to admit evidence about that conversation. However, during cross-examination by Shahin, Khokha testified that it takes "good results" to develop a successful practice, and the following colloquy occurred:

Q [Mr. Durick] Let's go back to when you started. Well, let's go—before we do that. How does a surgeon build up a practice?

A It takes time and good results.

Q And good results?

A Yes.

. . . .

Q ... My question to you was you are blaming all of these things on Dr. Shahin without being able to identity any doctor or any person in the community other than the Shahins—other than the Chamleys and their lawyers and court reporter that know about this?

A Am I blaming him?

Q Yes.

A Yes.

Q And your reason is, as I understand it, is you said that when there is a bad outcome in a surgery to a family like the Chamleys that in a small town like Williston that kind of a word gets around real fast, is that right?

A Yes, that's what I'm saying.

Q Well, you started practicing here in Williston in the fall I believe October— last part of October of 2003, did you not?

A Yes.

Q And in the first part of November of 2003 did you have occasion to operate on a young boy for an inguinal hernia?

A What type of hernia?

Q A hernia?

A Yes.

Q And how was the result of that particular case?

A It wasn't good.

Q Excuse me?

A I said it wasn't good.

Q The young boy was transferred to Bismarck, was he not?

A Yes.

Q And do you expect that that word got out in the community and those people talked about your abilities as a surgeon.

A They could.

Q And that was before the Chamley incident, was it not?

A Yes.

[¶ 19] Khokha's testimony provided evidence that word of a "bad outcome ... in a small town like Williston ... gets around real fast," which provided a factual basis for a specific instance of conduct that was generally known by others in the community before Shahin's statements to Chamley's family. *See Forster*, 2004 ND 207, ¶ 42, 689 N.W.2d 366. Moreover, Khokha's testimony about "good results" to develop a successful practice opened the door for Shahin to ask a question about a bad result with the young boy. *See State v. Hernandez*, 2005 ND 214, ¶¶ 20–21, 707 N.W.2d 449 (district court is vested with discretion to decide whether party has opened door for admission of evidence). We conclude the district court did not abuse its discretion in allowing Shahin to question Khokha about a bad surgical result that occurred before Shahin's February 15, 2004 statements to Chamley's family.

◼ [¶ 20] Khokha also argues the district court erred in permitting Shahin to ask him about internal hospital com-

plaints involving his surgical practice and in permitting Dr. Kevin Maxwell, a Williston radiologist, to opine about Khokha's reputation as a surgeon. Khokha claims Shahin misrepresented there was evidence of Khokha's reputation as a bad surgeon before Shahin's February 15, 2004 statements to Chamley's family. Khokha argues, however, the evidence did not establish his reputation was generally known in the community before Shahin's statements to the family in February.

[¶ 21] In a pretrial order, the district court decided Dr. Joseph Adducci could not testify about Khokha's reputation as a surgeon because, although Adducci had received reports about problems with surgeries performed by Khokha before January 2004 in Adducci's capacity as chairman of the Department of Surgery at Mercy Medical Center, Adducci lacked personal knowledge about Khokha's skills. However, the court ruled Maxwell could testify about Khokha's reputation because Maxwell had personal knowledge about Khokha's reputation as a surgeon. During the trial, the court allowed Shahin to ask Khokha if he knew that other doctors had complained about his surgical skills. After Khokha stated he had no knowledge of complaints made against him, the court did not allow further questioning of Khokha regarding complaints about his surgical skills. However, the court allowed Shahin to question Khokha about Adducci's role in the hospital's internal complaint procedure. The court also allowed Shahin to ask Maxwell about his knowledge of Khokha's surgical skills:

Q [Mr. Durick] And in your work as a radiologist do you have occasion to interpret imagery and make diagnosis of any problems that might develop after someone has surgery at Mercy Medical Center?

A Yes. Of course it is not uncommon if there are concerns about a patient's post-operative course to obtain some sort of imaging and of course I would [be] the one to look at those images.

Q And as a result of the imaging that you did at Mercy Medical Center did you form an opinion as to what the postoperative complication rate of Dr. Khokha was as compared with other surgeons who do operations at Mercy Medical Center?

A Yes, I did.

Q And can you tell the jury what that opinion is?

A I felt he had a higher complication rate than others.

Q And do you have an opinion as to the reputation of Dr. Khokha as a result of the imaging studies that you did?

. . . .

A My personal opinion is that he had a higher complication rate than other physicians—other surgeons.

Q Would you—would you refer any member of your family to Dr. Khokha?

A No.

Q Do you have any opinion as to the general reputation of Dr. Khokha among the physicians who were on the medical staff at Mercy Medical Center?

MR SCHREINER: Lack of foundation.

THE COURT: If that is a foundational objection, sustained. But go ahead and ask some foundational questions, Mr. Durick.

BY MR. DURICK:

Q As a member of the medical staff at Mercy Medical Center, would you be aware of how other physicians on the medical staff would view Dr. Khokha and his skills?

A Yes.

Q Okay. And as a result of that do you have an opinion as to what the general reputation of Dr. Khokha was among the medical staff?

MR. SCHREINER: Your Honor, I object again to lack of foundation. This time with specific regard to that, this does not include prior to the incident at issue in this case.

THE COURT: Break it down as far as time goes, Mr. Durick.

BY MR. DURICK:

Q When did you form your opinion of Dr. Khokha's skills or his reputation as a surgeon?

A Probably within the first year of his arriving at Mercy Medical Center.

Q Do you have any knowledge of whether physicians at Mercy Medical Center would refer patients to Dr. Khokha in the general course of their practices and I would say any time while he was there?

MR. SCHREINER: Object to lack of foundation.

THE COURT: No, I'll allow him to testify to that.

THE WITNESS: Yes. I did form the impression that a number of physicians specified that they would not refer their patients to Dr. Khokha.

[¶ 22] We conclude Maxwell's testimony was relevant to Khokha's reputation as a surgeon before Shahin's February 15, 2004 statements to Chamley's family, and the district court did not abuse its discretion in allowing that testimony. We further conclude Khokha has not demonstrated that the limited questions about Adducci's role in the hospital's internal complaint process was prejudicial. Adducci did not testify at trial, and contrary to Khokha's argument, the evidence in this case was not uncontroverted about whether Shahin's February 15, 2004 state-ments to Chamley's family were defamatory. Rather, Shahin disputed the content of those statements and the jury found those statements were not defamatory. On this record, we conclude Khokha has not demonstrated that his substantial rights were prejudiced by the district court's evidentiary rulings in this defamation action.

III

[¶ 23] Khokha argues the district court erred in deciding Shahin's February 15, 2004 statements to Chamley's family were subject to a qualified privilege.

[¶ 24] In *Soentgen v. Quain & Ramstad Clinic*, 467 N.W.2d 73, 78 (N.D.1991), we discussed the framework for privilege in a defamation action:

It is well established that there is no liability for defamatory statements that are privileged. NDCC 14–02–03; 14–02–04(3); *e.g., Emo v. Milbank Mutual Ins. Co.*, 183 N.W.2d 508 (N.D.1971); *Stafney v. Standard Oil Co.*, 71 N.D. 170, 299 N.W. 582 (1941). Privilege is based upon the sound public policy that some communications are so socially important that the full and unrestricted exchange of information requires some latitude for mistake. Prosser & Keeton on Torts (5th Ed.) 1984 §§ 114, 115; Restatement (2nd) of Torts, Conditional Privileges, pp. 242–43, 258; 50 Am. Jur.2d, Libel and Slander, § 195 (1970)....

Privilege is either absolute or qualified. *Farmers Educational & Co–op. Union of America v. WDAY, Inc.*, 89 N.W.2d 102 (N.D.1958), *aff'd* 360 U.S. 525, 79 S.Ct. 1302, 3 L.Ed.2d 1407 (1959); see Prosser & Keeton on Torts at §§ 114, 115. Absolute privilege is limited to situations in which the free exchange of information is so important that even defamatory statements made

with actual malice are privileged. NDCC 14–02–05(*l*) and (2); *WDAY.* In contrast, a qualified privilege may be abused and does not provide absolute immunity from liability for defamation. NDCC 14–02–05(3) and (4); *WDAY.*

[¶ 25] As relevant to this action, N.D.C.C. § 14–02–05(3), outlines a qualified privilege and provides:

A privileged communication is one made:

. . . .

3. In a communication, without malice, to a person interested therein by one who also is interested, or by one who stands in such relation to the person interested as to afford a reasonable ground for supposing the motive for the communication innocent, or who is requested by the person interested to give the information.

[¶ 26] The analysis of a qualified privilege requires a two-step process to determine: (1) if a communication's attending circumstances necessitate a qualified privilege; and (2) if so, whether the privilege was abused. *Soentgen,* 467 N.W.2d at 78. If the circumstances for a communication are not in dispute, the determination of whether there is a qualified privilege is a question of law for the court. *Id.* Whether a qualified privilege is abused is a question of fact. *Id.*

[¶ 27] Khokha argues the proper occasion for Shahin to speak to Chamley's family was under Mercy Medical Center's policy for responding to unexpected outcomes of care, which would have required participation in the meeting by Khokha and by hospital representatives, and the use of Chamley's medical records, including a pathology report regarding the removed kidney. Khokha claims Shahin violated the hospital policy and defeated any qualified privilege when he invited the Chamley family to his home to meet privately with them.

[¶ 28] The circumstances for Shahin's communication with Chamley's family are not in dispute. The record reflects Chamley's family contacted Shahin on February 15, 2004, with questions about the surgical procedures employed on their deceased mother, a long-time patient of Shahin, and Shahin met with the family at his home that evening to explain the procedures to the family. We believe the attending circumstances of Shahin's communications with the family occasioned a qualified privilege, because they were made by Shahin to an interested person requesting information under N.D.C.C. § 14–02–05(3). *See Fish v. Dockter,* 2003 ND 185, ¶ 12, 671 N.W.2d 819 (reporting condition of truck as part of duties as shop foreman was communication by person interested in subject matter to another who was also interested in it). We conclude the district court did not err in deciding that Shahin's statements to Chamley's family were made within the context of a qualified privilege. Whether Shahin complied with Mercy Medical Center's policy for responding to unexpected outcomes of care involves whether Shahin abused the qualified privilege, which was an issue for the trier of fact. *See Soentgen,* 467 N.W.2d at 78–80. We hold the district court did not err in instructing the jury on qualified privilege.

IV

[¶ 29] Because of our resolution of the preceding issues, it is unnecessary to address the remaining issues raised by Khokha, or the issues raised by Shahin in his cross-appeal.

V

[¶ 30] We affirm the judgment.

[¶ 31] KIRK SMITH, S.J., and DALE V. SANDSTROM, DANIEL J. CROTHERS and MARY MUEHLEN MARING, concur.

[¶ 32] The Honorable KIRK SMITH, S.J., sitting in place of KAPSNER, J., disqualified.