95 F.3d 75
 320 U.S.App.D.C. 387, 65 USLW 2203
 Daniel BECKER and Washington Area Citizens Coalition
Interested in Viewers' Constitutional Rights, Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents.
WAGA License, Inc., et al., Intervenors
 Nos. 95-1048, 95-1056.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 23, 1996.
Decided Sept. 13, 1996.
Rehearing Denied Nov. 13, 1996.
 
 [320 U.S.App.D.C. 388] Petitions for Review of an Order of the Federal Communications Commission.
 Andrew J. Schwartzman, Washington, DC, with whom Gigi B. Sohn was on the briefs for petitioner Washington Area Citizens Coalition Interested in Viewers' Constitutional Rights, argued the cause for both petitioners. A. Wray Fitch III and H. Robert Showers were on the briefs for petitioner Daniel Becker.
 Daniel M. Armstrong, Associate General Counsel, Federal Communications Commission ("FCC"), Washington, DC, with whom William E. Kennard, General Counsel, and Clifford G. Pash, Jr., Counsel, FCC, and Anne K. Bingaman, Assistant Attorney General, Robert B. Nicholson, and Andrea Limmer, Attorneys, United States Department of Justice, were on the brief, argued the cause for respondents.
 Irving Gastfreund, Washington, DC, was on the brief for intervenor WAGA License, Inc. Henry L. Baumann, Jack N. Goodman, and Steven A. Bookshester entered appearances for intervenor National Association of Broadcasters. Joel H. Levy entered an appearance for intervenor Louisiana Television Broadcasting Corporation. Robert B. Jacobi entered an appearance for intervenor Cohn & Marks.
 Before SILBERMAN and ROGERS, Circuit Judges, and BUCKLEY,* Senior Circuit Judge.
 BUCKLEY, Senior Circuit Judge:
 
 
 1
 These consolidated cases arise from the efforts of a candidate for federal office to air political advertisements portraying images of aborted fetuses during time periods of his selection. Petitioners Washington Area Citizens Coalition Interested in Viewers' Constitutional Rights ("WACCI") and the candidate, Daniel Becker, seek review of a Federal Communications Commission order permitting a broadcast licensee to restrict the broadcast of campaign advertisements that may be "harmful to children" to times of the day when children are less likely to be in the viewing audience. Petitioners claim that the ruling violates sections 312(a)(7) and 315(a) of the Communications Act of 1934 ("Act"). We agree.
 
 I. BACKGROUND
 A. Legal Framework
 
 2
 Petitioners' challenge involves two sections of the Communications Act. The first requires broadcasters to provide candidates for federal office with "reasonable access" to the broadcast media. 47 U.S.C. § 312(a)(7) (1994). The second guarantees all candidates for elective office equal opportunities in the use of the broadcast media, and it deprives licensees of the power of censorship over the material a candidate may wish to broadcast. Id. § 315(a). Of peripheral relevance here is a federal criminal statute prohibiting the broadcast of obscene, indecent, or profane language. 18 U.S.C. § 1464 (1994).
 
 B. The Facts
 
 3
 The 1992 election season witnessed the advent of political advertisements depicting the aftermath of abortions. See Lilli Levi, The FCC, Indecency, and Anti-Abortion Political Advertising, III Vill. Sports & Ent. L.J. 85, 86-88 (1996) ("Anti-Abortion Political Advertising"). In that year, Daniel Becker was a qualified candidate for election to the United States House of Representatives from Georgia's Ninth Congressional District. At 7:58 p.m. on July 19, Station WAGA-TV, which was then licensed to Gillett Communications of Atlanta, Inc. [320 U.S.App.D.C. 389] ("Gillett"), aired, at Mr. Becker's request, a campaign advertisement that included photographs of aborted fetuses. WAGA-TV received numerous complaints from viewers who saw the advertisement.
 
 
 4
 Anticipating that Mr. Becker would wish to broadcast similar materials later in the campaign, Gillett filed a petition with the Commission requesting a declaratory ruling on the following question:
 
 
 5
 Whether a licensee may channel a use by a legally-qualified federal candidate to a safe harbor when children are not generally present in the audience if the licensee determines in good faith that the proposed use is indecent or otherwise unsuitable for children.
 
 
 6
 Gillett Communications, Petition for Declaratory Ruling at 1 (July 28, 1992). This was followed by a petition by the law firm of Kaye, Scholer, Fierman, Hays & Handler ("Kaye Scholer"), representing various unnamed broadcasters, requesting a declaratory ruling that broadcast licensees may decline to air political advertisements that "present[ ] graphic depictions or descriptions of aborted fetuses or any other similar graphic depictions of excised or bloody fetal tissue, where there is, in the good-faith judgment of the licensee, a reasonable risk that children may be in the audience...." Kaye Scholer, Petition for Declaratory Ruling at 1 (July 29, 1992). The firm also asked for a ruling that any determination by a broadcast licensee that such advertisements are "indecent" within the meaning of 18 U.S.C. § 1464 will be upheld by the Commission. Id. at 2.
 
 
 7
 After viewing a tape of Mr. Becker's July 1992 advertisement, and in response to the two petitions, the FCC's Mass Media Bureau ("Bureau") found, in a letter released on August 21, 1992, that the advertisement was not indecent. Letter Ruling, 7 F.C.C.R. 5599, 5560 (Aug. 21, 1992). It also concluded that "the broad prospective relief that petitioners seek [was] inconsistent with the 'reasonable access' provision of the Act...." Id. Specifically, the Bureau stated that "[s]uch channeling would violate ... Section 312(a)(7) of the Act," because "channeling material that is not indecent ... would deprive federal candidates of their rights to determine how best to conduct their campaigns." Id. at 5599, 5600 (citation omitted). Kaye Scholer thereafter filed an Application for Review.
 
 
 8
 In October 1992, Mr. Becker again sought to purchase air time from WAGA-TV. He wished to broadcast a 30-minute political program entitled "Abortion in America: The Real Story" on November 1 between 4:00 p.m. and 5:00 p.m., following a televised professional football game. WAGA-TV refused to air the program at the time requested, claiming that the advertisement would violate the indecency provision of 18 U.S.C. § 1464. It stated that it would carry the program only within the safe harbor hours of midnight to 6:00 a.m. Mr. Becker filed a complaint with the FCC on October 27, 1992.
 
 
 9
 Faced with Mr. Becker's complaint and Kaye Scholer's application for review, the FCC issued a Request for Comments:
 
 
 10
 [W]e seek comment on all issues concerning what, if any, right or obligation a broadcast licensee has to channel political advertisements that it reasonably and in good faith believes are indecent. We also seek comment as to whether broadcasters have any right to channel material that, while not indecent, may be otherwise harmful to children.
 
 
 11
 7 F.C.C.R. 7297 (Oct. 30, 1992). That same day, the Bureau responded to Mr. Becker's complaint. Letter Ruling, 7 F.C.C.R. 7282 (Oct. 30, 1992). Noting that the FCC had solicited comments on the interplay of sections 312(a)(7) and 315(a) and the indecency provision of the criminal code, the letter stated that
 
 
 12
 until the Commission provides definitive guidance, ... it would not be unreasonable for the licensee to ... conclude that Section 312(a)(7) does not require it to air, outside the "safe harbor", material that it reasonably and in good faith believes is indecent.
 
 
 13
 Id. Mr. Becker subsequently filed an Application for Review with the Commission.
 
 
 14
 On November 22, 1994, the FCC issued the Memorandum Opinion and Order that is the subject of this appeal, denying Mr. Becker's Application for Review and granting [320 U.S.App.D.C. 390] Kaye Scholer's in part. In re Petition for Declaratory Ruling Concerning Section 312(a)(7) of the Communications Act, 9 F.C.C.R. 7638, 7649 (1994) ("Declaratory Ruling"). In it, the FCC concluded (1) that Mr. Becker's initial advertisement was not indecent, id. at 7643; (2) that there was evidence in the record "indicating that the graphic political advertisements at issue can be psychologically damaging to children," id. at 7646; (3) that "nothing in 312(a)(7) precludes a broadcaster's exercise of some discretion with respect to placement of political advertisements so as to protect children," id.; and (4) that channeling would not violate the no-censorship provision of section 315(a). Id. at 7649.
 
 
 15
 WACCI and Mr. Becker petition the court for review of this FCC order. WAGA License, Inc., has intervened on behalf of the FCC.
 
 II. ANALYSIS
 
 16
 At the outset, we must dispose of a preliminary issue. The Commission asks us to treat the petitions for review as facial challenges to a legislative act, thus requiring petitioners to demonstrate that there is no set of circumstances under which channeling would be permissible. See, e.g., Rust v. Sullivan, 500 U.S. 173, 183, 111 S.Ct. 1759, 1767, 114 L.Ed.2d 233 (1991). This argument is creative but hardly persuasive. Petitioners do not challenge the validity of sections 312(a)(7) and 315(a); they question the FCC's interpretation that those sections allow channeling. Therefore, because the administration of the Communications Act is entrusted to the FCC, the appropriate standard for review of the Declaratory Ruling is that set forth in Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984).
 
 
 17
 In that case, the Supreme Court stated that unless Congress has "directly spoken to the precise question at issue" (in which case "that is the end of the matter"), a court must defer to the agency's construction of the statute, so long as it is "permissible." Id. The Court has defined "permissible" as "rational and consistent with the statute." NLRB v. United Food & Commercial Workers Union, 484 U.S. 112, 123, 108 S.Ct. 413, 421, 98 L.Ed.2d 429 (1987). Because it is conceded here that Congress did not directly address the propriety of channeling, our task is to determine whether the Commission's construction of sections 312(a)(7) and 315(a) meets those criteria.
 
 A. Section 312(a)(7)
 
 18
 Section 312(a)(7) was added to the Communications Act by the Federal Election Campaign Act of 1971, Pub.L. No. 92-225. It provides that a station's license may be revoked
 
 
 19
 for willful or repeated failure to allow reasonable access to or to permit purchase of reasonable amounts of time for the use of a broadcasting station by a legally qualified candidate for Federal elective office on behalf of his candidacy.
 
 
 20
 47 U.S.C. § 312(a)(7) (emphasis added). The Act does not define "reasonable access." The FCC's policy guidelines, however, have indicated the nature of the access that the section guarantees a qualified candidate.
 
 
 21
 In the first of those guidelines, the Commission stated that
 
 
 22
 the provisions of Section 312(a)(7) impose upon licensees ... the specific responsibility to afford ... the opportunity to purchase reasonable amounts of time to legally qualified candidates for Federal elective office.... [T]he test of whether a licensee has fulfilled its obligations under Section 312(a)(7) is one of reasonableness....
 
 
 23
 * * * * * *
 
 
 24
 While the statute does not establish a precise or definite standard, ... we believe it is unreasonable and not in compliance with the statute for a licensee to adopt a rigid policy of refusing to sell or give prime-time programming to legally qualified candidates....
 
 
 25
 Such a refusal would deny the candidates access to the time periods with the greatest audience potential and would be inconsistent with the Congressional intent to give "... candidates for public office greater access to the media so that they may better explain their stand on the issues, [320 U.S.App.D.C. 391] and thereby more fully and completely inform the voters."
 
 
 26
 Licensee Responsibility under Amendments to the Communications Act Made by the Federal Election Campaign Act of 1971, 47 F.C.C.2d 516, 516-17 (1974) ("Licensee Responsibility") (emphasis added). See also Commission Policy in Enforcing Section 312(a)(7) of the Communications Act, 68 F.C.C.2d 1079, 1089 & n.14 (1978) ("Section 312(a)(7) Policy") ("Congress expressed a desire that licensees afford candidates ... a special right of access to a broadcasting station which no other groups enjoyed"; "a candidate's desires as to the method of conducting his ... media campaign should be considered by licensees in granting reasonable access.").
 
 
 27
 The Supreme Court found the Commission's approach to section 312(a)(7) to be "a reasoned attempt to effectuate the statute's access requirement," while at the same time accommodating broadcasters' discretion to the extent necessary. CBS, Inc. v. FCC, 453 U.S. 367, 390, 101 S.Ct. 2813, 2827, 69 L.Ed.2d 706 (1981). In so holding, the Court recognized that "Federal candidates are the intended beneficiary of § 312(a)(7)," id. at 392, 101 S.Ct. at 2828, and that the section "did more than simply codify the pre-existing public interest standard" governing broadcasters by "singl[ing] out" qualified candidates and "grant[ing] them a special right of access on an individual basis." Id. at 379, 101 S.Ct. at 2821.
 
 
 28
 More recently, the Commission issued "[f]ormal guidelines for reasonable access for federal candidates" in which it states that commercial broadcasters "must make program time available ... during prime time and other time periods unless unusual circumstances exist that render it reasonable to deny access." Codification of the Commission's Political Programming Policies, 7 F.C.C.R. 678, 681 (1991) ("1991 Policy Statement"). "Prime time" constitutes that part of the day in which the audience is likely to be the largest; the FCC has identified the hours of 7-11 p.m. as comprising prime time in the Eastern and Pacific time zones, and the hours of 6-10 p.m. in the Central and Mountain time zones. Political Primer 1984, 100 F.C.C.2d 1476, 1524 (1984). As an example of circumstances that would allow a broadcaster to decline to air a political program during prime time, the FCC has cited the situation "where the number of Federal candidates ... make it impossible for a station to make prime-time program-time available." Section 312(a)(7) Policy, 68 F.C.C.2d at 1090; see also Licensee Responsibility, 47 F.C.C.2d at 517.
 
 The FCC has also advised that
 
 29
 [a] station may not use a denial of reasonable access as means to censor or otherwise exercise control over the content of political material ... [and that]
 
 
 30
 ... Licensees may not adopt a policy that flatly bans federal candidates from access to the types, lengths, and classes of time which they sell to commercial advertisers.
 
 
 31
 1991 Policy Statement, 7 F.C.C.R. at 681.
 
 
 32
 Petitioners argue that the Declaratory Ruling deviates from its policy guidelines because there is nothing in them that would allow broadcasters to take the content of a political advertisement into account in determining what constitutes "reasonable access"; nor do they permit a licensee to deny a candidate access to adult audiences of his choice merely because significant numbers of children may also be watching television. Mr. Becker also objects to the ruling on the basis that it gives broadcasters a standardless discretion to determine whether an advertisement "may be harmful to children." For its part, the FCC contends that the ruling is consistent with both its past policies and the language and purpose of section 312(a)(7). Emphasizing its past practice of deferring to a broadcaster's reasonable and good faith discretion in making reasonable access decisions, the FCC argues that there is no basis for the position that it may never be appropriate for a broadcaster to take the graphic nature of abortion images into consideration when deciding at what hour to broadcast a particular advertisement.
 
 
 33
 We believe that petitioners have the better part of the argument. As we explain below, by permitting a licensee to channel political advertisements that it believes may harm children, the Declaratory Ruling frustrates [320 U.S.App.D.C. 392] what the Commission itself has identified as Congress's primary purpose in enacting section 312(a)(7); namely, to ensure "candidates access to the time periods with the greatest audience potential...." Licensee Responsibility, 47 F.C.C.2d at 517; see also Section 312(a)(7) Policy, 68 F.C.C.2d at 1090. The FCC claims, nevertheless, that its order is consistent with this policy, citing the following passage from Declaratory Ruling:
 
 
 34
 If licensees do channel, ... they are expected to provide access to times with as broad an audience potential as is consistent with the federal candidate's right to reasonable access. This is consistent with our general policy under Section 312(a)(7) that licensees should afford access to federal candidates in prime time, when access to voters is greatest.
 
 
 35
 9 F.C.C.R. at 7647. We are unpersuaded.
 
 
 36
 The problem with this statement is that it is not possible, on the one hand, to channel a political advertisement to a time when there is little risk "that large numbers of children may be in the audience," id., and, on the other, to assure the candidate of "as broad an audience potential as is consistent with [his] right of reasonable access." Id. We recently concluded, on the basis of an FCC study issued in 1993, that "there is a reasonable risk that large numbers of children would be exposed to any ... material broadcast between 6:00 a.m. and midnight." Action for Children's Television v. FCC, 58 F.3d 654, 665 (D.C.Cir.1995) (en banc) ("ACT"), cert. denied, --- U.S. ----, 116 S.Ct. 701, 133 L.Ed.2d 658 (1996). It is apparent, then, that a licensee will not be able to channel the advertisement to a time "when access to voters is greatest" without exposing it to substantial numbers of children.
 
 
 37
 We are faced, then, with competing interests--the licensee's desire to spare children the sight of images that are not indecent but may nevertheless prove harmful, and the interest of a political candidate in exercising his statutory right of "access to the time periods with the greatest audience potential." Licensee Responsibility, 47 F.C.C.2d at 517. The Commission has made it clear that when these two interests are in conflict, the licensee is free to decide in favor of the children. See Declaratory Ruling, 9 F.C.C.R. at 7646 ("we are unwilling to infer that Congress ... intended to strip licensees of all discretion to consider the impact of political advertisements featuring graphic depictions of abortions on children in their audience.").
 
 
 38
 Finally, while it is possible to visualize accommodations at the margin in which a political message is broadcast during school hours or the late, late evening when significantly fewer children are watching television, any such accommodation is apt to deprive a candidate of particular categories of adult viewers whom he may be especially anxious to reach. It is common knowledge that campaign strategists rely on survey research to target specific voting groups with television advertisements. See generally Dan Koeppel, The High-Tech Election (of 1992), Brandweek 18, Mar. 2, 1992. We can surmise, for example, that early shift factory workers whom a candidate wishes to reach are not apt to stay up beyond their normal bedtimes just to see his political advertisements. Thus, the ruling creates a situation where a candidate's ability to reach his target audience may be limited and his "personal campaign strategies ... ignored." See CBS, Inc., 453 U.S. at 389, 101 S.Ct. at 2826.
 
 
 39
 The FCC points out that it has previously acknowledged that " 'there may be circumstances when a licensee might reasonably refuse broadcast time to political candidates during certain parts of the broadcast day.' " Brief for Respondents at 25 (quoting Section 312(a)(7) Policy, 68 F.C.C.2d at 1091). The FCC has never defined those circumstances; but in describing the circumstances that a licensee is entitled to take into consideration in refusing candidates' access to particular time frames, the Commission's concerns have focused on making sure that the exercise by candidates of their rights under the section would not "disrupt a station's broadcast schedule." Section 312(a)(7) Policy, 68 F.C.C.2d at 1090; cf. CBS, Inc., 453 U.S. at 387, 101 S.Ct. at 2825 (to justify a denial of access, "broadcasters must cite a realistic danger of substantial program disruption ... or of an excessive number of equal time requests"). Thus, the FCC has advised that a licensee may take into account its "broader [320 U.S.App.D.C. 393] programming and business commitments, including the multiplicity of candidates in a particular race, the program disruption that will be caused by political advertising, and the amount of time already sold to a candidate in a particular race." 1991 Policy Statement, 7 F.C.C.R. at 681-82; see also Section 312(a)(7) Policy, 68 F.C.C.2d at 1090. None of these circumstances is remotely concerned with the content of a campaign advertisement, and we can see no connection between a licensee's right to protect his programming from disruption and a licensee's asserted right to shield children from the sight of disturbing images.
 
 
 40
 The Commission states, quite correctly, that in applying section 312(a)(7), it has always "rel[ied] upon the reasonable good faith judgments of licensees to determine what constitutes reasonable access." 1991 Policy Statement, 7 F.C.C.R. at 679; see also Section 312(a)(7) Policy, 68 F.C.C.2d at 1089. The Supreme Court has cautioned, however, that "endowing licensees with a 'blank check' to determine what constitutes 'reasonable access' would eviscerate § 312(a)(7)." CBS, Inc., 453 U.S. at 390 n. 12, 101 S.Ct. at 2827 n. 12. We believe that the standardless discretion that the FCC has granted broadcasters to channel political messages will do just that. While the Declaratory Ruling emphasizes that broadcasters may not channel an advertisement "out of disagreement with the candidate's political position," and that "[t]he licensee's discretion should relate to the nature of the graphic imagery in question and not to any political position the candidate espouses," 9 F.C.C.R. at 7647-48, the Commission now allows licensees to channel images based entirely on a subjective judgment that a particular advertisement might prove harmful to children. All that it asks is that that judgment be "reasonable" and made in good faith.
 
 
 41
 These are slippery standards, and it is of small solace to a losing candidate that an appellate court might eventually find that the Commission's approval of a licensee's channeling decision was an abuse of discretion or contrary to law. Moreover, the acceptance of a subjective standard renders it impossible to determine whether it was the advertisement's message rather than its images that the licensee found too shocking for tender minds.
 
 
 42
 In many instances, of course, it will be impossible to separate the message from the image, when the point of the political advertisement is to call attention to the perceived horrors of a particular issue. Indeed, this was the apparent purpose of many of the candidates who ran abortion advertisements similar to Mr. Becker's. See Anti-Abortion Political Advertising, III Vill. Sports & Ent. L.J. at 89 n.11 (discussing candidates who felt the advertisements were "a necessary offense," in order to "show that it's a life or death issue"). And the political uses of television for shock effect is not limited to abortion. See id. at 95 ("Other subjects that could easily lead to shocking and graphic visual treatment include the death penalty, gun control, rape, euthanasia and animal rights.")
 
 
 43
 Finally, in arguing that a licensee has the authority under the Act to channel material that might harm the young, the Commission points to Congress's "concern with protecting children from the adverse effects of televised material," Brief for Respondents at 19, and contends that "the public interest standard of the [Communications] Act clearly contemplates that appropriate measures may be taken to protect the well-being of children, as reflected in" other provisions of the Act. Id. at 20 (internal quotation marks and citation omitted) (discussing The Children's Television Act of 1990, § 102, 47 U.S.C. § 303a (directing FCC to prescribe rules limiting amount of commercial advertising during children's programming); Public Telecommunications Act of 1992, § 16(a), 47 U.S.C. § 303 note (instructing FCC to "promulgate regulations to prohibit the broadcasting of indecent programming ... between 6 a.m. and 12 midnight")).
 
 
 44
 We have a couple of problems with this argument. First of all, the first of the cited provisions deals with the quantity and duration of advertisements during children's programs, not their content; and the second places no restraints on the broadcasting of materials that are not indecent. Secondly, the Commission offers no evidence that Congress [320 U.S.App.D.C. 394] intended to subordinate a candidate's right of reasonable access to a licensee's assessment of the public interest. To the contrary, it seems to us that the right of access accorded candidates by sections 312(a)(7) and 315(a) overrides the programming discretion that is otherwise allowed licensees by the Act, except in those circumstances already specified in the Commission's policy guidelines.
 
 B. Section 315(a)
 
 45
 Section 315(a) contains the Act's "equal opportunity" and "no censorship" provisions:
 
 
 46
 If any licensee shall permit any person who is a legally qualified candidate for any public office to use a broadcasting station, he shall afford equal opportunities to all other such candidates for that office in the use of such broadcasting station: Provided, That such licensee shall have no power of censorship over the material broadcast under the provisions of this section....
 
 
 47
 47 U.S.C. § 315(a).
 
 
 48
 The FCC has recognized that the "[c]ase law interpreting [section 315(a) ] has uniformly barred licensees from exercising any power of censorship over the content of political broadcasts whether they are 'first' uses or responses to first uses." Hammond for Governor Committee, 69 F.C.C.2d 946, 947 (Broadcast Bur.1978). In its Declaratory Ruling, the FCC stated:
 
 
 49
 We are not granting licensees the ability to delete political statements. We are simply recognizing that a licensee may, consistent with its public interest obligations, channel political advertisements containing graphic abortion imagery to times when, although consistent with its obligation to provide reasonable access, the likelihood that children will be in the audience is diminished. This added measure of licensee discretion does not constitute "censorship" as that term is used in the Communications Act.
 
 
 50
 9 F.C.C.R. at 7649.
 
 
 51
 According to the FCC, that ruling is consistent with section 315(a)'s no censorship provision because the Commission was careful to emphasize broadcasters' continuing obligation to air, in full, political advertisements with graphic abortion images should they choose to channel them to times when there were not large numbers of children in the viewing audience. The Commission also insists that the ruling does not allow licensees to dictate what issues a candidate may address in its advertisement or to "exercise their discretion in a manner that has the practical effect of censorship" by, for example, airing the advertisement during a period of "minimal viewership," such as 2:00 a.m. to 6:00 a.m. Brief for Respondent at 27. The FCC further argues that, in any event, the competing public interest in protecting the welfare of children outweighs "the minimal intrusion on a candidate's unfettered ability to present his message at the particular time preferred by the candidate." Id. at 30.
 
 
 52
 For their part, petitioners assert that the ruling compromises section 315(a)'s no censorship provision in two ways: First, by granting licensees the content-based discretion to refuse to broadcast particular advertisements during a particular period, it enables them not only to discriminate against a candidate on the basis of speech, but to inhibit the manner in which he is able to discuss public issues. Second, by enabling the licensee to determine when an advertisement that "may be harmful to children" will air, the ruling deprives the candidate of the ability to convey his message when and how he sees fit by presenting him with the choice of either changing its content or accepting a time slot that deprives him of his preferred audience.
 
 
 53
 The FCC has never defined censorship in the context of section 315(a), although it has provided guidance in the form of lists of acts that constitute censorship and of those that do not--neither of which refers to channeling. See Political Primer 1984, 100 F.C.C.2d at 1510-13. The Supreme Court, however, has stated that
 
 
 54
 [t]he term censorship, ... as commonly understood, connotes any examination of thought or expression in order to prevent publication of "objectionable" material. We find no clear expression of legislative intent, nor any other convincing reason to indicate Congress meant to [320 U.S.App.D.C. 395] give "censorship" a narrower meaning in § 315.
 
 
 55
 Farmers Educ. & Coop. Union of Am. v. WDAY, Inc., 360 U.S. 525, 527, 79 S.Ct. 1302, 1304, 3 L.Ed.2d 1407 (1959). In WDAY, Inc., the Court held that section 315(a) prohibited a broadcaster from removing defamatory statements from the advertisements of a legally qualified candidate. From the Court's discussion, we may discern two guiding principles: First, the basic purpose of section 315(a) is to permit the "full and unrestricted discussion of political issues by legally qualified candidates." Id. at 529, 79 S.Ct. at 1305. Second, the section reflects Congress's "deep hostility to censorship either by the Commission or by a licensee." Id. at 528, 79 S.Ct. at 1305.
 
 
 56
 Although the Court was discussing a case in which a licensee sought to excise certain references in a political advertisement, we believe that these principles apply with equal force to this case because of the leverage that the threat of channeling provides a licensee in the heat of a political election. As the Court observed in WDAY, Inc.,
 
 
 57
 [b]ecause of the time limitation inherent in a political campaign, erroneous decisions by a station could not be corrected by the courts promptly enough to permit the candidate to bring improperly excluded material before the public. It follows from all this that allowing censorship ... would almost inevitably force a candidate to avoid controversial issues during political debates ... and hence restrict the coverage of consideration relevant to intelligent political decision. We ... are unwilling to assume[ ] that Congress intended any such result.
 
 
 58
 360 U.S. at 530-31, 79 S.Ct. at 1306. See also Port Huron Broadcasting Co., 12 F.C.C. 1069, 1072 (1948) (to permit the restriction of potentially libelous material would allow broadcasters to "set themselves up as the sole arbiter of what is true and what is false[,] ... an exercise of power which may be readily influenced by their own sympathies and allegiances," and give broadcasters "a positive weapon of discrimination between contesting candidates which is precisely the opposite of what Congress intended to provide in this section").
 
 
 59
 Not only does the power to channel confer on a licensee the power to discriminate between candidates, it can force one of them to back away from what he considers to be the most effective way of presenting his position on a controversial issue lest he be deprived of the audience he is most anxious to reach. This self-censorship must surely frustrate the "full and unrestricted discussion of political issues" envisioned by Congress.
 
 
 60
 The rationale behind WDAY, Inc. requires us to agree with petitioners that "censorship" encompasses more than the refusal to run a candidate's advertisement or the deletion of material contained in it. The FCC itself has indicated that it understands the Supreme Court's definition of censorship to be broader than it will now acknowledge. In Radio Station WPAM, 81 F.C.C.2d 492 (1980), after initially refusing to run a candidate's potentially defamatory advertisement, Station WPAM informed the political committee that was paying for it that "the spot would be broadcast 'as is', but stated that [the committee] would thereby risk the consequences of a later lawsuit" for defamation. Id. at 493. As a result, the candidate revised the text of his advertisement. Id. The Commission observed that
 
 
 61
 were it not for WPAM's intimidating actions in the present case, i.e., [its] initial refusal to accept the announcement as submitted, followed by grudging acceptance coupled with a threat of subsequent legal action, the candidate would not have been required by the sponsoring Committee to revise the spot. We believe that this result was reasonably foreseeable. We further believe that the actions here constituted censorship, within the Supreme Court's definition in WDAY, Inc. ... in violation of Section 315(a) of the Act.
 
 
 62
 Id. at 495. It concluded by "serving notice ... that in the future any attempts by a licensee to coerce a candidate to revise his political announcement, albeit by threat of litigation or otherwise, will be considered censorship...." Id.
 
 
 63
 In D.J. Leary, 37 F.C.C.2d 576 (1972), the FCC affirmed that a licensee may not require [320 U.S.App.D.C. 396] a candidate to execute an agreement to indemnify the licensee against liability resulting from the candidate's political advertisement because such an agreement "is likely to inhibit a candidate's use of a broadcast facility and possibly to affect his decision on whether to utilize a station to address the public." Id. at 577. The FCC explained that
 
 
 64
 it was the intent of Congress to insure complete freedom of expression by political candidates, and therefore the no-censorship provision of Section 315 prohibits any interference, direct or indirect, with such expression.
 
 
 65
 Id. at 578 (emphasis added). We believe that a licensee's right to channel political advertisements will inevitably interfere with a candidate's freedom of expression by requiring him to choose between what he wishes to say and the audience he wishes to address. See Gray Communications Systems, Inc., 19 F.C.C.2d 532, 535 (1969) ("the basic objective of section 315 [is] to permit a candidate to present himself to the electorate in a manner wholly unfettered by licensee judgment as to the propriety or content of that presentation"); id. (section 315(a) applies to "all program material presented as part of a candidate's use of a broadcast facility, with no right of prior approval of format or content on the part of the licensee"); In re Inquiry Concerning "Equal Time" Requirements under Section 315, 40 F.C.C. 357, 359 (1962) ("the Act bestows upon the candidate the right to choose the format and other similar aspects of the material broadcast") (internal quotations omitted).
 
 
 66
 Finally, section 315(a) not only prohibits censorship, it also requires that candidates be given "equal opportunities" to use a broadcaster's facilities. To satisfy this requirement, a broadcaster must "make available periods of approximately equal audience potential to competing candidates to the extent that this is possible." Political Primer 1984, 100 F.C.C.2d at 1505. The FCC claims that the Declaratory Ruling does not involve the equal opportunity provision because there was no equal opportunity request before it. Because the equal opportunity requirements "forbid any kind of discrimination by a station between competing candidates," however, channeling clearly implicates the equal opportunity provision of section 315(a).
 
 
 67
 This is so because if a station channels one candidate's message but allows his opponent to broadcast his messages in prime time, the first candidate will have been denied the equal opportunity guaranteed by this section. On the other hand, if the station relegates the opponent's advertisements to the broadcasting Siberia to which the first candidate was assigned, it would be violating the opponent's right of reasonable access under section 312(a)(7). We agree with petitioners that these provisions may not be read to create such a tension.
 
 
 68
 We conclude from the above that permitting the content-based channeling of political advertisements thwarts the objectives of both section 312(a)(7) and section 315(a) by restricting candidates' ability to "fully and completely inform the voters," CBS, Inc., 453 U.S. at 379, 101 S.Ct. at 2822 (internal quotation marks and citation omitted), and by inhibiting the "full and unrestricted discussion of political issues by legally qualified candidates," WDAY, Inc., 360 U.S. at 529, 79 S.Ct. at 1305. Because the Declaratory Ruling is based on impermissible constructions of the Act to which we owe no deference, see Chevron, 467 U.S. at 843, 104 S.Ct. at 2781, we hold that it is without legal effect.
 
 
 69
 In light of the above, we decline to address Mr. Becker's argument that channeling a candidate's campaign advertisements violates that candidate's First Amendment rights. See Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring) ("[I]f a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter.").
 
 III. CONCLUSION
 
 70
 The Commission's Declaratory Ruling violates the "reasonable access" requirement of section 312(a)(7) by permitting content-based channeling of non-indecent political advertisements, [320 U.S.App.D.C. 397] thus denying qualified candidates the access to the broadcast media envisioned by Congress. The ruling also permits licensees to review political advertisements and to discriminate against candidates on the basis of their content, in violation of both the "no censorship" and "equal opportunities" provisions of section 315(a). Therefore, we grant the petitions for review and vacate the ruling.
 
 
 71
 So ordered.
 
 
 
 *
 At the time of oral argument, Judge Buckley was a circuit judge in active service. He assumed senior status on September 1, 1996